# TYNER v. UNITED STATES.

# BARRETT v. UNITED STATES.

---

CRIMINAL LAW; CONSPIRACY TO DEFRAUD THE UNITED STATES; MISCONDUCT IN OFFICE; INDICTMENT.

1. The gist of the offense defined in U. S. Rev. Stat. § 5440, U. S. Comp. Stat. 1901, p. 3676, being a conspiracy to commit an offense against or to defraud the United States, notwithstanding it remains incomplete until the commission of some act to effect its object, it must be charged in the indictment against the alleged conspirators with that degree of certainty requisite in all indictments under the laws of the United States; and such charge cannot be aided in respect of its certainty by the necessary additional averments of the overt act or acts.

2. All the material facts and circumstances embraced in the definition of the offense charged in an indictment, must be stated, and if any essential element of the crime is omitted such omission cannot be supplied by intendment or implication. The charge must be made directly, and not inferentially or by way of recital.

3. Indictments against two government officials for conspiracy to defraud the United States, which in their introductory part charge the defendants with certain duties under certain departmental regulations, and also with certain additional duties not prescribed by such regulations but not inconsistent with any provisions of law, and which are reasonable and natural extension of the duties so prescribed, sufficiently charge a violation of duty; but under such circumstances such duties as

are prescribed by the regulations require no proof, while such additional duties must be proved like other facts.

4. In indictments against the Assistant Attorney General and Assistant Attorney for the Postoffice Department for conspiracy to defraud the United States in violation of U. S. Rev. Stat. § 5440, U. S. Comp. Stat. 1901, p. 3676, by failing to report the conclusions arrived at by them upon consideration of schemes for the misuse of the mails and defrauding the public, referred to them for investigation and report, it is not necessary to allege and prove that any such scheme was within the prohibition of the law, the duty to so report existing whether the scheme was lawful or unlawful.

5. Such indictments are not demurrable which, after sufficient averment of the official duty imposed upon the defendants, charge, with no lack of certainty in respect to time, place, and circumstances, that the defendants conspired not to discharge such duty, but instead to substitute a general opinion as to such alleged fraudulent schemes, artfully planned to secure each of the parties engaged in such schemes in the unobstructed use of the mails, until at least the expiration of the official connection of one of the defendants with the Postoffice Department, and to secure for him thereafter employment by such interested parties as attorney for them, and the collection of large sums of money as fees.

6. While it is the general rule that there are no common-law offenses against the United States, such rule does not apply to the District of Columbia (following *De Forest* v. *United States*, 11 App. D. C. 458) ; and the common law being in force in the District of Columbia when U. S. Rev. Stat. § 5440, U. S. Comp. Stat. 1901, p. 3676, was enacted, which makes it an indictable offense to conspire to commit any offense against or to defraud the United States in any manner and for any purpose, any common-law offense not repealed, superseded, or plainly inconsistent with existing legislation or necessarily obsolete is an offense against the United States within the meaning of that section.

7. Official misconduct in office, being an offense under the common law, is an offense in the District of Columbia, and is an offense against the United States, whether it is an offense against the United States when committed by Federal officers in any of the States or territories; and it is immaterial that such offense was a misdemeanor at common law while the conspiracy to commit it by reason of the character of the penalty prescribed by U. S. Rev. Stat. § 5440, U. S. Comp. Stat. 1901, p. 3676, becomes an infamous offense. Criminal laws in the various Federal courts are not required to be uniform throughout the territories and districts, whether within or without the restrictions of the Constitution.

8. To defraud means, not only to deprive or withhold from one that which

belongs to or is due him, but also to deprive him of any right by
artifice or wrong practised upon him.

9. To defraud the United States within the meaning of U. S. Rev. Stat.
§ 5440, U. S. Comp. Stat. 1901, p. 3676, does not necessarily mean to
do the United States a pecuniary injury (following *Palmer* v. *Colla-
day*, 18 App. D. C. 426); and any wilful or corrupt misconduct on
the part of an official of the Postoffice Department that operates to
impair the administration of the affairs of that department, works
a wrong to the United States and does them some substantial injury
within the meaning of that section. Such injury may be pecuniary
in its nature or one of general damage, not of a specific character
susceptible of certain ascertainment and pecuniary compensation.

10. A statute which is made for the good of the public ought, although
it is penal, to receive equitable construction.

Nos. 1396 and 1397.   Submitted March 1, 1904.   Decided April 5, 1904,

HEARING on appeals (specially allowed) from orders of the
Supreme Court of the District of Columbia sitting as a criminal
court overruling demurrers to two indictments for the crime of
conspiracy under U. S. Rev. Stat. § 5440 (U. S. Comp. Stat.
1901, p. 3676).                                        *Affirmed.*

The COURT in the opinion stated the case as follows:

In each of these cases a special appeal has been allowed from
an interlocutory order of the supreme court of the District of
Columbia overruling defendant's demurrer to the indictment
which charges them with the crime of conspiracy under Rev.
Stat. § 5440 (U. S. Comp. Stat. 1901, p. 3676).

The recitals of the indictments are identical, save in respect
of the particular offense which is made their predicate.   In
1396 the conclusion is that the defendants "unlawfully did con-
spire, combine, confederate, and agree together to defraud the
United States;" whilst in 1397 it is "to commit an offense
against the United States, that is to say, the offense of miscon-
duct on the part of him, the said James N. Tyner, in his said
office of Assistant Attorney General for the said Postoffice De-
partment, to be done and committed by him the said James N.
Tyner as aforesaid."

The introductory averments of the indictment, after reciting the statutes prohibiting the carriage in the mails of matter in aid of lotteries and other schemes to defraud the public, and prescribing the powers and duties of the Postmaster General, together with the practice of his department in relation thereto, are: (1) That James N. Tyner was the Assistant Attorney General for the Postoffice Departme⁀ t from June 1, 1897, to April 22, 1903; that Harrison J. Barrett, from June 1, 1897, to July 1, 1899, was law clerk in the office of the said Assistant Attorney General, and from July 1, 1899, until January 1, 1901, was Assistant Attorney therein; (2) that it was the duty of the said Tyner, as Assistant Attorney General, to investigate all cases of use of the mails by persons suspected of being engaged in the prosecution of lotteries and fraudulent schemes that might be brought to his attention by reference from the Postmaster General or otherwise; and if, upon such investigation, it appeared to him that any such use of the mails was within the prohibition of the law, it was his duty to report his conclusion and opinion in the case to the Postmaster General with a statement of the facts upon which such conclusion and opinion were based, together with a recommendation that a "fraud order" should be issued in such case whereby the misuse of the mails by such persons would be immediately stopped, it being the usual practice of the Postmaster General to issue the order upon such report and recommendation; (3) that said Barrett, whose duty it was to assist said Tyner in the matters aforesaid, had, on July 3, 1900, determined to resign and retire from his said office on December 31, 1900, and had agreed with one J. Henning Nelms to enter into a partnership with him on January 1, 1901, with a view to representing before the Postoffice Department and the said Assistant Attorney General persons using the mails in the prosecution of schemes and plans of business which might then and thereafter be under investigation by said Tyner in the course of his duty aforesaid; (4) that between July 3 and November 1, 1899, there were pending before said Tyner the cases of eighty persons or companies—fifty of these being named and thirty charged as of names unknown—for investigation and report to

the Postmaster, General whether their schemes and plans of business were obnoxious to the laws aforesaid, and such, therefore, as to debar them from the use of the mails in the prosecution of the same; (5) that the investigation aforesaid was completed by said Tyner and Barrett, between October 18 and November 1, 1900, and the conclusion arrived at that the schemes of each of said persons were obnoxious to the laws aforesaid, and that matter relating thereto was prohibited from transmission through the mails; (6) that having formed an opinion as aforesaid, it became the duty of said Tyner to report the same to the Postmaster General, together with a statement of the evidence upon which the same was based, and a recommendation that the order issue to prevent the further use of the mails by the said persons; but that, disregarding his duty aforesaid, by reason of the conspiracy, etc., hereinafter charged, the said Tyner did not submit a report of the conclusion and opinion aforesaid, together with a statement of the evidence upon which said opinion was based, and did not recommend the issue of the prohibitory order aforesaid.

Following these introductory averments, the charge of conspiracy appears in the following words:

"That on the said first day of November, in the year of our Lord one thousand nine hundred, and at the District aforesaid, the said James N. Tyner and the said Harrison J. Barrett did unlawfully conspire, combine, confederate, and agree together in contravention of their duty in the premises, not to report the conclusion and opinion aforesaid to the said Postmaster General, together with a statement of the evidence upon which the same were based, and with a recommendation that such fraud orders be issued by the said Postmaster General against the companies last aforesaid so engaged in the conduct, promotion, and furtherance of each of the schemes and plans of business last aforesaid; and to submit to the said Postmaster General an opinion as hereinafter stated, in lieu of such report, statement, and recommendation last aforesaid, and to prevent so far as in them, the said James N. Tyner as such Assistant Attorney General, and the said Harrison J. Barrett as such assistant attorney, the

power lay, the enforcement of the laws aforesaid, by the said Postmaster General against the companies last aforesaid, and to keep the question of issuing such fraud orders against the companies last aforesaid, open and undetermined by him, the said Postmaster General, until the thirty-first day of December, in the year of our Lord one thousand nine hundred, and for such period of time thereafter as the said Harrison J. Barrett might desire, and in the meantime to permit the unobstructed use of the mails to the companies last aforesaid in the conduct, promotion, and furtherance of their schemes and plans of business aforesaid, to the prejudice of the said United States and the obstruction and prevention of the orderly and due administration of the said laws, and for the advancement of the pecuniary interest of the said Harrison J. Barrett, upon his retirement from the said department, as aforesaid, and the entering upon such practice of the law by him, the said Harrison J. Barrett, as aforesaid; which advancement of such pecuniary interest of him, the said Harrison J. Barrett, should be accomplished in the manner following, as well as by the acts and omissions agreed upon, as aforesaid, that is to say: That he, the said Harrison J. Barrett, should, at some time prior to such retirement from office by him, the said Harrison J. Barrett, prepare and submit an opinion in writing to the said Postmaster General relating to the schemes and plans of business of the companies last aforesaid, to be signed by him, the said Harrison J. Barrett, as Assistant Attorney and acting Assistant Attorney General for the Postoffice Department, which opinion should be approved in writing by the said James N. Tyner, as such Assistant Attorney General, and for which opinion the approval of the said Postmaster General in writing should also be obtained as a matter of official routine by him, the said James N. Tyner, as such Assistant Attorney General, and the said Harrison J. Barrett, as such Assistant Attorney; and that in such opinion it should be set forth and stated, in substance, that the schemes and plans of business of a number of companies to be described in said opinion as "so-called bond investment companies," the names of which should not be mentioned therein (but to mean and intend by such

description the companies in respect to whose schemes and plans of business the said James N. Tyner, as such Assistant Attorney General, and the said Harrison J. Barrett, as such Assistant Attorney, had, upon such investigation as aforesaid, reached the conclusion and opinion aforesaid), had been presented to the said James N. Tyner, as such Assistant Attorney General, by reference from the said Postmaster General, or otherwise, for an expression of opinion as to whether or not the transmission in the mails of matter relating to such schemes and plans of business last aforesaid and the delivery of mail matter and the payment of postal-money orders to such companies last aforesaid, should be forbidden under the laws aforesaid; and that in the opinion aforesaid the schemes and plans last aforesaid should be divided into ten classes, and each of such classes be held and declared to be obnoxious to the laws aforesaid, and each such scheme and plan of business last aforesaid be held and declared to fall within one or the other of the said ten classes, as being in each instance a lottery or a scheme to defraud, or both; and that in such opinion it should also be held and declared that the basic principle underlying the schemes and plans of business last aforesaid was sound, and that each of them was susceptible of amendment so and in such manner as to relieve them of their objectionable features under said laws, and to entitle the companies engaged in the conduct, promotion, and furtherance of the same, to the unobstructed use of the mails in such conduct, promotion, and furtherance of the same, refraining, however, from setting forth or stating in such opinion in what particular or in what manner such amendments might be made in any particular case, and leaving that matter open to speculation and conjecture on the part of the companies last aforesaid, and recommending that a reasonable time be given such companies last aforesaid for the abandonment of their said schemes and plans of business or for the making of such amendments before such use of the mails by them, the companies last aforesaid, should be interfered with by the said Postmaster General through the issue by him of such fraud orders against them, such companies last aforesaid; they, the said James N. Tyner

and the said Harrison J. Barrett, then well knowing the fact to be that in the usual course of business in the said department the determination of what would be such reasonable time would be a matter resting with, and under the control of him, the said James N. Tyner, as such Assistant Attorney General; and that he, the said James N. Tyner, as such Assistant Attorney General would take no action against any of the companies last aforesaid, contrary to the wish and desire of him, the said Harrison J. Barrett, in that behalf; and that when the approval of such opinion by the said Postmaster General had been thus obtained, thereupon said opinion, together with such approvals thereof by the said James N. Tyner, as such Assistant Attorney General, and by the said Postmaster General, should be printed in pamphlet form at the expense of the said United States and sent to each of the companies last aforesaid, with a circular letter of the said James N. Tyner, as such Assistant Attorney General, calling their attention to said opinion and stating that the particular scheme and plan of business of such company last aforesaid fell within one of the said classes; and that upon such sending of such pamphlet opinion and such circular letter to each of said companies, as aforesaid, that the said Harrison J. Barrett should send to each of them, the companies last aforesaid, a printed announcement in which it should be stated in substance that the said Harrison J. Barrett, Assistant Attorney for the Postoffice Department, begged to announce that he would retire from the said department on the first day of January in the year one thousand nine hundred and one, and that he would thereafter be associated with J. Henning Nelms, a member of the Baltimore bar, in the practice of law in Baltimore and Washington; in order that by said opinion in pamphlet form said circular letter and said announcement, and from the previous connection of the said Harrison J. Barrett with the said office of the said Assistant Attorney General, the impression should be made on the companies receiving such opinion, circular letter, and announcement that with the exception of the said James N. Tyner, he, the said Harrison J. Barrett, alone knew in what particulars the schemes and plans of business of the companies

last aforesaid required amendment, and the nature of the
amendments so required in the said schemes and plans of
business of the companies last aforesaid, to relieve such
schemes and plans last aforesaid from objection under said
laws and to secure for them the approval of the said James N.
Tyner, as such Assistant Attorney General, and to secure the
companies last aforesaid, in the operation of such schemes and
plans as thus amended, the unobstructed use of the mails of the
said United States; and by the means and in the manner last
aforesaid, and by a refusal of them, the said James N. Tyner,
as such Assistant Attorney General, and the said Harrison J.
Barrett, as such Assistant Attorney, after such rendering and
printing of such opinion, to act upon and consider during the
remainder of the said year one thousand nine hundred, any ap-
plication of the companies last aforesaid, for the approval by
him, the said James N. Tyner, as such Assistant Attorney Gen-
eral, of any amended schemes and plans of business which might
be submitted by them, the companies last aforesaid, to him the
said James N. Tyner, as such Assistant Attorney General, to
create the further impression on the companies last aforesaid that
it would be greatly to the interest and advantage of them, the com-
panies last aforesaid, to employ them, the said Harrison J. Bar-
rett and the said J. Henning Nelms, rather than other attorneys
and agents, for the purpose of making such amendments and of
obtaining such approval thereof by the said James N. Tyner, as
such Assistant Attorney General, to the end that the companies
last aforesaid should be induced to employ the said Harrison J.
Barrett to represent them before the said James N. Tyner, as
such Assistant Attorney General, and before the said Postoffice
Department, in the matter of making such amendments, securing
such approval, and obtaining such unobstructed use of the mails
for matter relating to the business of the companies last aforesaid
and to pay to him, the said Harrison J. Barrett, large sums of
money for services to be rendered by him in that behalf; and
that upon such employment of him, the said Harrison J. Barrett,
he, the said James N. Tyner, as such Assistant Attorney General,
should approve any amended schemes or plans of business of

the companies last aforesaid, prepared and submitted to him by the said Harrison J. Barrett."

The acts charged as done to effect the object of the conspiracy in each case may be summarized as follows: (1) On December 5, 1900, the said Barrett, under the title of "Assistant Attorney and Acting Assistant Attorney General for the Postoffice Department," submitted an opinion in writing to the Postmaster General in relation to the cases referred for investigation, wherein he stated substantially "that, in the consideration of the said question, the various plans and schemes of business used by the companies last aforesaid were grouped as nearly as possible into classes, and that he had omitted all reference to any company by name, and had found that the schemes and plans last aforesaid of the companies last aforesaid were either lotteries or similar enterprises for the distribution of prizes by lot or chance, or were fraudulent within the meaning of the statutes forbidding the use of the mails in the promotion of such enterprises; nevertheless, that if changed and modified in some of their features they would not be objectionable to the laws aforesaid, in their operation and conduct, and that he recommended that a reasonable time should be allowed to the companies last aforesaid for the abandonment of their said schemes and plans of business after their attention had been called to the necessity of modifying the same or for making such changes as would eliminate therefrom all objectionable features before action should be taken by the said Postmaster General to deprive them of the use of the mails."

(2) That the said Tyner indorsed his approval of said opinion in writing thereon, and he and Barrett then, on December 8, 1900, prepared a letter for the signature of the then Postmaster General, approving the said opinion, which said letter they procured him to sign. (3) Defendants next procured the printing, at the Government Printing Office, of 500 copies of said opinion in pamphlet form, one of which was sent to the Southern Mutual Investment Company, of Lexington, Kentucky, together with a printed circular signed by said Tyner officially, advising it that its scheme and plan of business fell

within one of the classes mentioned in the said opinion. And it is further alleged that the same course was pursued with each of the persons heretofore named in the indictment. (4) That on the same day the said Barrett mailed to each of said persons and companies a card announcing that he would retire from his position on January 1, 1901, and then become associated with J. Henning Nelms, a member of the Baltimore bar, in the practice of law in Baltimore and Washington. (5) That on December 20, 1900, the said Barrett wrote and mailed the following letter to J. P. Williams, at Louisville, who was then the president of the New Orleans Debenture Company, one of the eighty persons before mentioned:

My Dear Sir: I have received your favor of the 17th instant.

This is written at home, and as I have not your contracts at hand I cannot answer you specifically in regard to your 25 per cent and 15 per cent debentures, though from my recollection the principles involved are the same as in other contracts set out in the opinion. I will, however, ask Gen'l Tyner, the Assistant Attorney General, to write you specifically on these points.

While my work at the department has practically ceased, yet my official connection will not be severed until Dec. 31, so that I would not feel at liberty to discuss ways and means with you. My associate and I will be pleased to act as your attorneys after Dec. 31, and you could, of course, correspond with Mr. Nelms now. I believe we can eliminate all the objectionable features in the contracts, and put them in such form that they will meet with the approval of the Department. Our fee would be one thousand dollars retainer, and one hundred dollars a month for twelve months. I suggest this latter provision, inasmuch as during the coming year details may have to be adjusted, and new features and improvements in contracts will suggest themselves for consideration and submission to the Department. We would render you any service that might be necessary in this connec-

tion, and communicate to you whatever we might learn of advantage to your company.

I may add for your information that the Department does not intend to interfere with the operations of any company until they have had reasonable opportunity to perfect and present new forms of contract which will be approved.

I am, very truly yours,

HARRISON J. BARRETT.

P. S.—Our offices will be in the Calvert Building, Baltimore, though within a short time we may have a branch here. Baltimore, as you know, is only 45 minutes by train from Washington, and telephone connections make them practically one city.

(6) That the said agreement between said Barrett and said Nelms was entered into; the said Nelms, who was then the attorney for the Mutual Fidelity Company of Baltimore, agreeing to divide the sum of $2,000 per annum which he was to receive from said company.

(7) That said Barrett purposely retained in the office of the Assistant Attorney General aforesaid, without action thereon, a report of an official inspector charging that the said Mutual Fidelity Company of Baltimore was operating a fraudulent scheme within the prohibition of the law, and advising that it be called upon to show cause why a "fraud order" should not be issued against it; which said report had been referred to the said Tyner by the Postoffice Department on November 23, 1900.

(8) That on December 18, 1900, certain officers of the Southern Mutual Investment Company called upon said Barrett at his office to ascertain what might be necessary for the amendment of their scheme so as to retain the use of the mails, and were informed by him that his connection with the government would cease on December 31, 1900, and that, in the meantime, he could not give official attention to the matter; and they were further informed by the said Tyner that he would not take up such matters for consideration until after January 1, 1901.

(9) That thereafter, on the same day, said parties called upon

said Nelms in Baltimore, and agreed to pay him the sum of $1,000 in case he would procure the immediate approval, by said Tyner and Barrett, of such amendments to their existing scheme of business as would enable them to continue to enjoy the unobstructed use of the mails.

(10) That on December 19, 1900, said parties, with Nelms, had another interview with said Tyner, to whom said Nelms stated a proposed amendment which said Tyner approved.

(11) That on December 20, 1900, the said Barrett prepared a written memorandum of the amended scheme for the use of said Tyner in the preparation of a letter approving the same, which letter, embodying the said amendment, was written on January 8, 1901.

(12) That on December 21, 1900, one George W. Morgan, president of the Continental Security Redemption Company, of Birmingham, Alabama, called upon said Barrett at the office of said Tyner for the purpose of ascertaining if its scheme could be amended so as to meet with approval, and that said Morgan agreed with said Barrett to pay him the sum of $800 after January 1, 1901, if he would procure the approval of said Tyner of a scheme of business satisfactory to the said company and in the meantime protect it from interference by the Postmaster General in the use of the mails.

(13) That on January 3, 1901, one Charles A. Spenny, president of the Equitable Debenture Company, of Columbus, Ohio, called upon said Tyner to ascertain in what particulars it would be necessary to amend said company's scheme so as to relieve it from objection and secure it the free and unobstructed use of the mails, and was told by said Tyner that it would facilitate his business if he would employ an attorney familiar with that kind of business,—the said Tyner then and there recommending said Barrett as such an attorney.

(14) That the said Spenny immediately thereafter employed said Barrett, and agreed to pay him a fee of $500 to obtain the approval of said Tyner to a scheme of business satisfactory to said company; and thereupon, on the next day, said Barrett called upon said Tyner in company with Spenny, and submitted

to him a scheme amending the existing one of said company, which the said Tyner approved in a letter, without examination and upon the verbal assurance of said Barrett that the same was free from objection.

*Mr. A. S. Worthington,* for the appellants·

1. A criminal statute applies only to acts which are distinctly and specifically covered by it. It is axiomatic that no act, however wrongful, is covered by such a statute unless clearly within its terms. *United States* v. *Wiltberger,* 5 Wheat. 76, 96; *United States* v. *Brewer,* 139 U. S. 237, 238; *Todd* v. *United States,* 150 U. S. 278, 282; *France* v. *United States,* 164 U. S. 676, 682, 683.

2. Particularity and certainty are required in indictments. An indictment in a criminal case must furnish the accused with such a description of the charge against him as will enable him to make his defense and avail himself of his conviction or acquittal in a subsequent prosecution for the same offense. It must inform the court of the facts alleged, so that it may decide whether they are sufficient in law to support a conviction, if one should be had. Facts are to be stated, and not conclusions of law. For applications of this doctrine to indictments for conspiracy, see *United States* v. *Cruikshank,* 92 U. S. 557, 559. Also *United States* v. *Hess,* 124 U. S. 483, in which it was held that a count in an indictment under U. S. Rev. Stat. ·§ 5440, which charged that the defendant had devised a scheme to defraud divers persons to the grand jurors unknown which he intended to carry into effect by the use of the mails, and that he had attempted to execute the scheme by receiving from the postoffice a communication from one of his intended victims, was bad, even after conviction and sentence, because it did not state the particulars of the alleged scheme to defraud.

3. In considering a demurrer to an indictment under § 5440, paragraphs alleging overt acts must be disregarded. The court looks only to that part of the indictment which refers to the conspiracy. *United States* v. *Britton,* 108 U. S. 205.

4. The words "to defraud the United States" in § 5440 refer only to a pecuniary injury. *United States* v. *Thompson,* 24 Fed. 86; *United States* v. *Owen,* 32 Fed. 534; *Re Benson,* 56 Fed. 962; *United States* v. *Hirsch,* 100 U. S. 33, 35. "The conspiracy here described is conspiracy to commit any offense against the United States. The fraud mentioned is a fraud against them. *It may be against the coin, or consist in cheating the Government of its land or other property.*"

A different conclusion on this subject was reached in *United States* v. *Bunting,* 82 Fed. 883, and in *United States* v. *Curley,* 122 Fed. 738. And this court gave an intimation in the same direction, but did not decide the question in *Palmer* v. *Colladay,* 18 App. D. C. 426. In none of those cases was the attention of the court called to the above-quoted language of the Supreme Court in *United States* v. *Hirsch.* And in all of them the indictment, while it was under § 5440, was not for conspiracy to defraud the United States, but for conspiracy to commit an offense against the United States. In all of them the offense charged was a violation of § 5418, which punishes the *false making of any writing* for the purpose of defrauding the United States. While it is insisted here that the words "to defraud the United States" in either section should be held to refer only to pecuniary injury, because of the impossibility of any person knowing in advance what acts might be held within the statute, if the words are given a broader meaning, still it is obvious that the making of a false writing is a specific and clearly described act, and is akin to forgery; so that while a statute making it an offense to *defraud* the United States by means of a false writing might be stretched to include all acts where the false writing would *injure* the United States in any way, it would be a very different thing to hold that the words "to defraud the United States" in § 5440 refer to any act whatever done by anybody which could in any way operate to the disadvantage of the government. Carried to its logical result, such a conclusion would justify in noncapital cases the substitution for all criminal statutes of the United States of a provision that whoever should do

any act injurious to the United States should be sent to the penitentiary for not more than thirty years.

But in the present case there is absolutely no averment that any of the eighty companies referred to in the indictment was engaged in the lottery business or in carrying out schemes to defraud. There is no averment even that any of those concerns was using the mails or intended to use them. The only charge in this regard is that *the defendants had reached the conclusion* that these concerns were obnoxious either as lotteries or schemes to defraud, and that the defendants conspired to delay the issuing of fraud orders "and in the meantime to permit the unobstructed use of the mails to the companies last aforesaid in the conduct and furtherance of their schemes or plan of business aforesaid" to the prejudice of the United States and the obstruction and prevention of the administration of the laws.

The pleader seems to have thought, when writing the phrase just quoted, that he had described "the schemes and plan of business of these companies" when, as a matter of fact, he had done nothing of the kind. The averment that the *defendants had reached the conclusion* that these companies were carrying on a lottery business or schemes to defraud by the use of the mails, and that the defendants conspired to delay action and therefore permit the companies to have the "unobstructed use of the mails," cannot supply the place of the direct averments that the companies *were* engaged in illegal schemes and *were* using, or intending to use, the mails.

Such a charge must be made directly, and not inferentially and by way of recital. *United States* v. *Hess,* 124 U. S. 486.

A charge that a defendant had in his possession counterfeit money, which is described; that he passed it to another person, who is named, with intent to defraud that person, states facts from which a strong inference arises that the defendant knew that the money was counterfeit; but such an indictment is bad because of the omission of the direct averment of knowledge. *United States* v. *Carll,* 105 U. S. 611.

In an indictment under § 5440 it was charged that the defendants conspired to defraud the United States of its title t·

certain land. A necessary element of the particular offense was that the land contained minerals. The indictment charged that the defendants *knew* the land contained valuable mineral deposits. The indictment was held bad, because there was no direct averment that the land did in fact contain minerals. *United States* v. *Peuschel,* 116 Fed. 642.

No doubt it will be suggested here, as it was suggested in the court below on behalf of the government, that there is enough in these indictments to show that the United States was injured because the defendants were being paid by the government for the performance of certain duties, and that they did not perform those duties properly, and that therefore the government was defrauded. It it difficult to discuss this suggestion seriously. If sustained, it would mean that where anybody employed by the government—from a day laborer to the President of the United States—agrees with some other person or persons to do anything, or to omit to do anything, which might be considered inconsistent with the duties of the position which he holds, an indictment under § 5440 would lie, because by carrying out the agreement the government might be defrauded or its interests might suffer in some way of such supposed *misconduct.* The acceptance by a government clerk of an invitation to attend a game of base ball, which might require him to leave his office before the usual hour, under such a construction of the statute would subject the parties to an indictment for conspiracy to defraud the United States, or to lead the clerk to commit the offense of misconduct in office.

And this suggestion, absurd as it is, is evidently an afterthought. If it was in the mind of the pleader when he drew the indictment, he did not manifest it by anything in the indictment contained. It is not averred that either of the defendants was a salaried officer of the government. It is not averred, as shown above, that anything they agreed to do, or leave undone, could have injuriously affected the interests of the government in any way.

5. The indictments do not show that the defendants did in

fact disregard or neglect any duty imposed upon them or either of them.

It is conceded by the defendants that regulations adopted by a head of a department under authority of law are to be considered as a part of the law, of which the court takes judicial notice. There is nothing in any statute which prescribes the duties of either of the defendants. A postal regulation was made prescribing the duties of the defendant Tyner; there was none as to the defendant Barrett. And the regulation which prescribed the duties of the defendant Tyner, while it gave him charge of "the hearing and preparation of cases relating to lotteries and the misuse of the mails in furtherance of schemes to defraud the public," did not require him to report his conclusion or opinion to the Postmaster General or to furnish the Postmaster General with a statement of the facts upon which such conclusion or opinion was based, or to make any recommendation as to whether a fraud order should or should not issue. The indictment not only does not charge that Tyner neglected the duty which is imposed upon him by the regulation of hearing and preparing cases relating to lotteries and misuse of the mails in furtherance of schemes to defraud, but it affirmatively declares that he did perform that duty. The things which it is said he did not do are all things which he was not required to do by any statute or any regulation made thereunder. As to Barrett, neither law nor regulation prescribed any of his duties. All that is essential or material, therefore, in this indictment in respect to the duty of either Tyner or Barrett is the bare statement contained in the indictment that it was their duty to do thus and so.

In pleading in either civil or criminal cases where it is sought to hold a defendant responsible for the neglect of a duty imposed upon him by law, the pleadings must show in what way the alleged duty was imposed, so that the court can see whether the obligation did in fact rest upon the defendant. *Brown* v. *Mallett,* 5 C. B. 615; *Gantrel* v. *Egerton,* L. R. 2 C. P. 371; *Smith* v. *Tripp,* 13 R. I. 152; *Priestly* v. *Fowler,* 3 Mees. &

W. 1; *Parnably* v. *Canal Co.* 11 Ad. & El. 223; Bishop, Directions & Forms, 530.

In *United States* v. *Reichert,* 32 Fed. 142, it was held by Mr. Justice Field that an indictment was bad because, among other things, while it charged that the surveyor general had the power to pass upon certain claims, it did not show how he became possessed of that power.

It is unnecessary to consider, however, any of these authorities, because the exact point was decided by this court in the case of *Ainsworth* v. *United States,* 1 App. D. C. 518. The defendants in that case were charged with manslaughter in having brought about the destruction of a number of lives by failing to properly guard the work of underpinning a certain pier in a building which was under repair. In the indictment it was set out that the defendants had undertaken and assumed the performance of this work, and that they had the entire care, control, charge, and supervision thereof, and that it then and there "became and was their duty to so regulate and conduct the performance of the work and all particulars thereof as not to endanger the stability of the second and third floors of the building" (p. 521). Yet it was held that the indictment was fatally defective, *because it did not show how this joint duty was imposed upon the defendants.* Chief Justice Alvey, in delivering the opinion of the court, explicitly states that the allegation in the indictment that the defendants undertook and assumed the performance of all or a part of the work, and that they had entire care, charge, control, and supervision thereof, were merely general conclusions from precedent facts, and that the facts should have been stated upon the face of the indictment, so that the court could decide whether there was a duty created and imposed upon all the defendants alike.

In considering the effect of these regulations, it must be remembered that in *United States* v. *Eaton,* 144 U. S. 677, it was held that a violation of a departmental regulation or direction cannot in any case constitute a criminal offense unless a statute so prescribes; and that in *United States* v. *Britton,* 108 U. S. 199, it was held that the defendants could not be punished

under § 5440 for conspiracy to commit an offense when the alleged offense which it was the object of the conspiracy to commit consisted in doing something which was forbidden by a statute of the United States, but which was not expressly made a penal act.

6. Even if these indictments charged, as they do not, that the eighty concerns referred to were using the mails or intended to use them, there would still remain the fatal defect that it is nowhere averred that the defendants *knew* that the mails were being so used, or that the concerns in question, or any of them, intended to use the mails.

In *Pettibone* v. *United States,* 148 U. S. 197, an indictment under § 5440 was held bad after conviction and sentence, because, while it charged that the defendants had conspired to obstruct justice in a court of the United States by interfering with an officer of the court in the performance of his duties, it did not specifically aver that the defendants knew that the person referred to was an officer of the United States engaged in the execution of the process of the court.

And in *United States* v. *Carll,* 105 U. S. 611, it was held that an indictment which charged the defendant with passing a forged bill to a certain bank with intent to defraud the bank was bad because in the indictment it was not directly averred that the defendant knew that the bill was counterfeit.

So, even if the pleader in this case had set forth how it was that all the duties which the defendants are charged with neglecting were imposed upon them, this indictment is bad; because even if it was Tyner's duty to advise the Postmaster General to issue fraud orders in proper cases, that duty could not arise unless he knew that the mails were being used, or were to be used, for unlawful purposes. And as to that important condition precedent no inference will avail,—the fact of knowledge must be directly charged.

And in the same connection the attention of the court is called to the fact that it is not even averred in these indictments that there was *any evidence* before Tyner tending to show either that these companies, or any of them, were engaged in a business

which was unlawful, or that they were using, or contemplating using, the mails in furtherance of such business. The only charge in this direction is that Tyner and Barrett had reached the conclusion that the schemes and plans of business of these companies were obnoxious to the laws forbidding the use of the mails by persons engaged in carrying on lotteries or schemes to defraud, and it thereupon became the duty of Tyner to report his conclusion and opinion to the Postmaster General, "with a statement of the evidence upon which such conclusion and opinion was based." There is absolutely no suggestion anywhere in the indictment that in fact there was any evidence before Tyner which he could transmit to the Postmaster General. The pleader assumes that Tyner could not have reached such conclusion without evidence, and then piles assumption upon assumption by assuming that the evidence, whatever it was, was in writing and was in such a form that it could be transmitted to the Postmaster General. But in an indictment of this character nothing will prevail except a direct charge that there had been placed in the hands of Tyner evidence tending to show that the companies in question were engaged in a forbidden business, and that they were using or contemplating using the mails in furtherance of that business.

7. It is essential to the validity of these indictments that the act of Congress giving the Postmaster General power to issue fraud orders allows him no discretion; that as soon as it is determined that any person, firm, or corporation is passing through the mails any matter which the Postmaster General deems to be a lottery or scheme to defraud the public, within the meaning of the statutes relating to those subjects, he must immediately issue a fraud order, and thereby destroy the business of such person, firm, or corporation. This construction is not consistent with a reasonable view of the statute, nor with the manner in which it has been construed by the departments of the government from the time it was passed.

And since the Postmaster General did have discretion as to issuing a fraud order in any case, it necessarily follows that (even if it appeared that it was Tyner's duty to give advice to the Post-

master General) he was to take that fact into consideration.   In that case it would depend upon the facts in each particular case whether it was Tyner's duty to advise the Postmaster General to issue a fraud order, or simply to give an opinion that the particular business was in violation of the law, leaving it for the Postmaster General to decide whether the attention of the offender should be called to the fact, so that he might, either by abandoning the scheme or modifying it to meet the objection made by the Department, keep from being ruined by being prevented from receiving any mail matter whatever.

If there is anything in these indictments which is fundamental and necessary to their salvation, it is that Tyner was required to recommend a fraud order whenever he found that the law was being violated, regardless of consequences to the offender.   And indeed the indictment goes further and charges that it was in Tyner's power to require the Postmaster General to approve such recommendation "as a matter of official routine."   And all this in face of the fact that neither by statute nor by regulation was he required to make any recommendation whatever.

8. There is no such offense known to the law of the United States as "misconduct in office."   There is no such thing as a common-law offense of any kind against the United States.   It is not necessary to refer to authorities on these propositions, because they are admitted by the government.   But it is contended that since misconduct in office is an offense at common law and the common law is in force in this District by virtue of the act of Congress of February 27, 1801 (2 Stat. at L. 103, chap. 15), a conspiracy to commit the offense of misconduct in office is within the terms of § 5440, when the conspiracy is *entered into in this District.*

It is respectfully submitted that without express words indicating such an intention Congress cannot be held to have intended in § 5440, by the words "to commit any offense against the United States," to make one law for this District and another for the rest of the country.   The position of the government requires it to maintain that every petty offense in this District is an offense against the United States, and that a conspiracy to

commit it is within § 5440. All indictments and all informations in this jurisdiction conclude with the phrase "against the peace and government of the United States and against the statute in such case made and provided," or with words of similar import. Every offense, from petty larceny up, is against a statute—the statute making the common law applicable here if there be no act of Congress specifically covering the case.

It seems clear that Congress could not have intended to include all offenses in this District, however insignificant, by the phrase "any offense against the United States." There is no reason why the misconduct of a government official in Washington should be made a crime while precisely the same conduct of an official holding a similar office in Baltimore or New York would not be punishable at all.

Misconduct in office is undoubtedly an offense at common law. Where that misconduct amounts to bribery, or any other serious offense, it constitutes of itself a specific crime. The cases in which mere misconduct in office is charged usually grow out of some neglect on the part of the official which has proved injurious to third persons. Probably it is because mere misconduct is in itself usually a trifling offense that we find no case in which it has been thought necessary to attempt to punish officials for merely agreeing to commit the offense of misconduct.

But whether the alleged misconduct be serious or not, one thing is required in every indictment based upon such an alleged offense—that is, that it must be averred that the parties acted *corruplly*. 2 Bishop, Crim. Proc. § 834; *State* v. *Odell,* 8 Blackf. 396; *State* v. *Pinger,* 57 Mo. 243; *People* v. *Ward,* 85 Cal. 585; *State* v. *Gardner,* 2 Mo. 28; *State* v. *Hein,* 50 Mo. 362; *People* v. *Coon,* 15 Wend. 277.

It is evident under this rule that it would not be sufficient in an indictment for such a conspiracy to charge that the defendants corruptly conspired to do the forbidden thing. The wrongful element in the conspiracy could not supply the necessary wrongful ingredient in the proposed offense. But in this indictment the only charge is that the defendants wilfully conspired, and there is no averment that the things which they were to do

or omit to do were to be done or omitted corruptly.    Nor is there any expression or phrase which will take the place of that necessary averment.

*Messrs. Robert Crain* and *O. F. Hershey,* also for appellants:

1.  For definitions of conspiracy and overt act see *Pettibone* v. *United States,* 148 U. S. 203; *United States* v. *Frisbie,* 28 Fed. 808; *United States* v. *Britton,* 108 U. S. 199; *United States* v. *Milner,* 36 Fed. 890; *Com.* v. *Hunt,* 4 Met. 111.    For requirements of valid conspiracy indictment see *United States* v. *Hess,* 124 U. S. 483; *United States* v. *Walsh,* 5 Dill. 58; *United States* v. *Taffe,* 86 Fed. 114; *United States* v. *Watson,* 17 Fed. 145; *United States* v. *Melfi,* 118 Fed. 899; *Com.* v. *Hunt,* 4 Met. 111; *People* v. *Arnold,* 46 Mich. 268; *Evans* v. *People,* 90 Ill. 384; *March* v. *People,* 7 Barb. 190; *Evans* v. *United States,* 153 U. S. 587.    A close analysis of these indictments shows that these well-established principles of the law are violated.    Not only is no crime charged, but even assuming, *ad arguendo,* that there is, the charges are not properly laid.    Appellants maintain: That no conspiracy is shown; that every alleged act and fact set forth is as consistent with innocence as with guilt; that no crimes are charged, or that if any crimes are charged the essential ingredients of such crimes are not sufficiently or properly set forth; that if the various assumptions of the pleader be eliminated, the indictments collapse like a broken chain; and that in various technical features both indictments are bad.

2.  It is evident from an analysis of these indictments that the king-pin of this structure is the pleader's conception of the duty cast upon General Tyner in the premises as Assistant Attorney General and Mr. Barrett as Assistant Attorney.    This duty is based upon the following statutes and regulations:    U. S. Rev. Stat. §§ 388, 396, 161, 390; Sec. 7, Postal Laws & Regulations, 1893.

The duty alleged to submit a "report," "statement of the facts," or "evidence," and "recommendation" that fraud orders

issue, is a mere conclusion of the pleader drawn from the regula-
tion of the Postmaster General, and this conclusion, while neces-
sary to sustain the indictments, is in itself unwarranted.

The duty of General Tyner as Assistant Attorney General
was, as shown, to give opinions on questions of law when re-
quested by the Postmaster General and to hear and prepare lot-
tery and fraud cases. Nothing is said in the regulation prescrib-
ing this duty about a "report," "statement of evidence," and
"recommendation" that fraud order issue. The Postmaster·
General could, if he wished (and it is nowhere alleged that he
did not), request an opinion in the form and manner presented.
If an opinion on any matter before General Tyner was submitted
to the Postmaster General whether directly requested or not, it
was for the Postmaster General to determine whether the
same should be acted on. In short, the pleader has not only mis-
conceived, but has improperly alleged the duties of General Ty-
ner. He assumes that it was mandatory upon him to make this.
"report" and "recommendation" that fraud order issue as soon
as a "conclusion and opinion" was formed by him. This as-
sumption is the gist of the whole case.

Rev. Stat. §§ 3929, 4041, as amended, provide that "the Post-
master General *may,* upon evidence satisfactory to him that any
person or company is engaged in conducting any lottery, etc., or·
that any person or company is conducting any other scheme or·
device for obtaining money or property of any kind through the
mails by means of false and fraudulent pretenses, etc., instruct·
postmasters at any postoffice at which registered letters (and
all letters or other matter) arrive directed to any such person or·
company, etc.," to return the same to the senders with the word
"fraudulent" plainly written or stamped on the outside there-
of, and to refuse the payment to said person or company of any
postal money orders drawn to his or its order, etc., the amount.
of such orders to be returned to the remitters.

The law is permissive, and the authority granted is to be exer-
cised within the discretion of the Postmaster General. This
"discretion" was in practice actually exercised by the Assistant.
Attorney General.

Therefore, if General Tyner had himself taken the action complained of in these indictments—that is to say, given the companies concerned notice and opportunity to quit the objectionable business before fraud orders issue— he would have been acting entirely within the practice and regulations of the Department and guilty of no crime.   But the matter being an important one, the Postmaster General doubtless requested that an opinion be submitted to him, or else General Tyner thought it best to submit the matter to him for his approval or disapproval.   And the Postmaster General actually approved the opinion and recommendation of General Tyner.

Without "evidence" that the said eighty companies were then conducting through the mails a business which was in fact a lottery or fraudulent, the Postmaster General could not issue fraud orders, and the fact that General Tyner had no "evidence" to present to him—it is nowhere in the indictments alleged that he had such evidence—further confirms the deduction that the Postmaster General requested an "opinion" as rendered by General Tyner to be a guide in all similar cases where "evidence" was obtained.   The Postmaster General could only act on "evidence" of the existence of, and use of the mails in the conduct of, a lottery or fraudulent enterprise, not on the "conclusion and opinion" of the Assistant Attorney General, and the indictments do not aver that such "conclusion and opinion" were based on "evidence."   See *American School of Magnetic Healing* v. *McAnnulty,* 187 U. S. 94; Thomas, Lotteries, Frauds in the Mails, §. 312.

3.  It will be noted that in the indictments there is not the remotest approach to a statement of the necessary ingredients of the crime of conspiracy, but, having set up various supposed *duties,* it is now proposed to have the minds of General Tyner and Mr. Barrett meet in a criminal conspiracy, by alleging that they have not done their duty as the pleader conceives it, but have done something else, to wit: (1) They gave an "opinion" instead of a "report;" (2) had they given a "report," it would have "immediately" closed up these eighty companies; (3) they did not name the companies concerned; (4) they allowed them

to amend; (5) they did not tell them how to amend; (6) they had and retained exclusive knowledge of the law; (7) General Tyner was to favor Mr. Barrett, *assuming* he would remain in office, and that such matters would be referred to him; (8) notice of this "opinion" and Mr. Barrett's retirement should go out, and an "impression, etc." be created. Does the doing or nondoing of these things raise a presumption of conspiracy? If not, where else in the indictments or in what other way does the pleader make out the meeting of minds or "breathing together?" Even if all these were proper allegations would they not just as readily sustain the theory of honorable conduct as of criminal conspiracy? Merely to charge conspiracy is not sufficient; acts, means, etc., must be shown. Given the true theory of General Tyner's duty, and what becomes of these alleged wrongful acts? Even under the pleader's theory of duty they are entirely consonant with innocence.

4. To "defraud the United States" means to deprive it of something of value or to do some act by which it suffers. The essence of fraud must be there, and combined with it there must be the other elements of intent, wrongful act, etc., which enter into a criminal act. A breach of duty or a failure to perform the requirements of office or an act which may bring the government of the United States into disrepute or contempt is not an act to defraud the United States. There must be some actual substantive loss; some deprivation of something of value. *United States* v. *Thompson,* 12 Sawy. 151, 29 Fed. 861; *United States* v. *Owen,* 32 Fed. 534; *Re Benson,* 58 Fed. 92; 70 Fed. 591. See also *United States* v. *Perin,* 131 U. S. 55; *United States* v. *Milner,* 36 Fed. 890; *United States* v. *Taffe,* 86 Fed. 114; *United States* v. *Green,* 115 Fed. 343. The three cases which the pleader had in mind as he was constructing this romance of crime were: *Palmer* v. *Colliday,* 29 Wash. L. Rep. 532; *United States* v. *Bunting,* 82 Fed. 883; *United States* v. *Curley,* 122 Fed. 739. These cases are readily distinguishable from this, but even if the rule laid down in them, which is opposed to good reason and the cases cited, is adopted by this court, still in the indictment at bar it is not shown that

the United States is prejudiced or injured in its rights or priv-
ileges.   Conceding that the defendants wilfully omitted to en-
force, as was their duty, a law in connection with which noth-
ing was left to discretion, this would not constitute a conspiracy
to "defraud the United States," but one to prevent the due en-
forcement of such law, which is not *per se* an offense against the
United States.   Indictments analogous to the one under con-
sideration were held defective in *United States* v. *Taffe* and
*United States* v. *Milner, supra.*   Also see *United States* v.
*Reichert,* 32 Fed. 142.   But, even if the court thought that "to
defraud" had the vague and inclusive meaning contended for by
the government, the indictments would nevertheless be bad as not
setting forth the charge with that certainty and particularity
which the law requires, and for the other reasons shown.   In the
United States, a general charge of conspiracy to defraud is not
allowed.   *United States* v. *Cruikshank,* 92 U. S. 558; *Com.* v.
*Hunt,* 4 Met. 111; *Com.* v. *Eastman,* 1 Cush. 189; *Alderman* v.
*People,* 4 Mich. 414; *State* v. *Parker,* 43 N. H. 83; *State* v.
*Jones,* 13 Iowa, 269; *People* v. *Baldwin,* 37 Mich. 455.   The
indictment should aver that the acts complained of were "wil-
fully" and "corruptly" done; otherwise, even conceding that
General Tyner and Mr. Barrett erred in judgment, they com-
mitted no offense of any kind.   These acts in themselves were
all perfectly lawful, and the charge of "conspiracy" does not
supply the averments necessary to make them wrongful.

   5. There is no such offense known to the United States as
"misconduct in office."   This court must construe this indict-
ment the same as any other Federal court, and there are no com-
mon-law offenses against the United States.   *United States* v.
*Britton,* 108 U. S. 199.   Even if the common law did apply,
the indictment does not charge a common-law offense in sub-
stance or in terms or in proper form.   "Misconduct in office" is
a sufficiently vague and general term to suit indictments of this
character.   Fortunately, however, the authorities have fairly
well defined the meaning of this phrase.   In order to be indict-
able, "misconduct in office" must have about it those same evi-
dences of criminality which enter into any other offense.   There

must be the same combination of criminal intent and wrongful act that there is in any other crime. There must be a wilful, corrupt, and intentional wrongdoing. *State* v. *Odel,* 8 Blackf. 396; *State* v. *Porter,* 2 Treadw. (S. C.) 694; *Lining* v. *Bentham,* 2 Bay (S. C.) 1; *People* v. *Norton,* 7 Barb. 477; *King* v. *Halford,* 7 Mod. 193; *Garnett* v. *Ferrand,* 6 Barn. & C. 611; *State* v. *Finger,* 57 Mo. 243; *State* v. *Ward,* 85 Cal. 585; *State* v. *Coon,* 15 Wend. 277; *State* v. *Gardner,* 2 Mo. 23; *State* v. *Hein,* 50 Mo. 362; *State* v. *Miller,* 100 N. C. 543; *Cope* v. *Ramsey,* 2 Heisk. 197; *Dowing* v. *Herrick,* 47 Me. 462. The allegation of conspiracy does not supply these necessary averments. The acts of General Tyner and Mr. Barrett, singly or jointly, are perfectly lawful; the combination of the two by assumptions of fact or conclusions of law does not make them criminal. General Tyner might, in perfect good faith and conscience, have agreed with Mr. Barrett that the course followed in connection with these so-called "cases" was the proper one, knowing full well that Mr. Barrett intended to resign and accept employment as attorney from the companies concerned in such cases. It must be shown that he acted "corruptly," to make out any offense. Would General Tyner be indictable alone for "misconduct in office" on these allegations? This can only be answered in the negative, and this answer is fatal to this indictment. Bishop, Crim. Law, § 459. Mechem, Pub. Offi. § 1022; *State* v. *Coon,* 14 Minn. 459; *State* v. *Hagernon,* 13 N. J. 314; *State* v. *Fishblate,* 83 N. C. 654; *State* v. *Wayne,* 97 N. C. 388; *State* v. *Gardner,* 2 Mo. 22; *State* v. *Hein,* 50 Mo. 362; *People* v. *Standish,* 6 Park. Crim. R. 111; *State* v. *Williams,* 34 N. C. 172. Failure to perform any duty depending on judgment and discretion is not indictable. The statute gives the Postmaster General power to issue a fraud order "upon evidence satisfactory to him," the Postmaster General. The averment that upon recommendation by the Assistant Attorney General it was the custom of the Postmaster General to issue a fraud order is not sufficient. The allegation must be of a fact, and positive. The words of the statute "may issue" are permissive, and cannot, as shown, be construed as mandatory. But even if the court should

hold the statute was "mandatory" upon the Postmaster General, "upon evidence satisfactory to him," neither he nor his Attorney. General or his assistant, to whom he has referred a matter concerning a fraud order for consideration, would be guilty of misconduct, etc., if upon reaching the conclusion that a fraudulent or lottery enterprise was being conducted through the mails a fraud order was not issued. *Citizens' Ins. Co.* v. *March,* 41 Pa. 386.

*Mr. Morgan H. Beach,* United States Attorney for the District of Columbia, and *Mr. Charles A. Keigwin,* Assistant Attorney, for the United States.

Mr. Justice SHEPARD delivered the opinion of the Court:

The indictments in these cases were found under Rev. Stat. § 5440 (U. S. Comp. Stat. 1901, p. 3676), which reads as follows:

"If two or more persons conspire, either to commit any offense against the United States or to defraud the United States in any manner, or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, all the parties to such conspiracy shall be liable to a penalty of not more than ten thousand dollars, or to imprisonment for not more than two years, or to both fine and imprisonment in the discretion of the court."

The conspiracy to commit an offense against or to defraud the United States is the gist of the crime, notwithstanding it remains incomplete until the commission of some act to effect its object, and must, therefore, be charged with that degree of certainty requisite in all indictments under the laws of the United States.

And this charge cannot be aided in respect of its certainty by the necessary additional averments of the overt act or acts. *Pettibone* v. *United States,* 148 U. S. 197, 202, 37 L. ed. 419, 422, 13 Sup. Ct. Rep. 542.

"The general rule in reference to an indictment," as stated in that case, "is that all the material facts and circumstances embraced in the definition of the offense must be stated, and that

if any essential element of the crime is omitted such omission cannot be supplied by intendment or implication. The charge must be made directly, and not inferentially or by way of recital." In a later case it was further said: "The indictment must be free from all ambiguity, and leave no doubt in the minds of the accused and the court of the exact offense intended to be charged, not only that the former may know what he is called upon to meet, but that upon a plea of former acquittal or conviction the record may show with accuracy the exact offense to which the plea relates." *Evans* v. *United States,* 153 U. S. 584, 587, 38 L. ed. 830, 831, 14 Sup. Ct. Rep. 934.

Having stated the general rules governing the sufficiency of indictments of this character, we pass to the consideration of the points of objection urged by the appellants on their demurrers, dealing first with those that apply to both indictments alike.

1. The first and most important of these relates to the paragraph of the introductory averments which sets out the official duties of the defendants, respectively, as Assistant Attorney General and Assistant Attorney. In the language of appellant's brief, "the king-pin of this structure is the pleader's conception of the duty cast upon" these defendants, respectively.

The duties of the Assistant Attorney General for the Postoffice Department are not prescribed by the statute creating the office (§ 390, Rev. Stat.) but arise under the authority of the head of the Department to make regulations for the conduct of officers and clerks. In the regulations published in 1893, the Assistant Attorney General is charged with the duty of giving opinions to the Postmaster General upon questions of law arising in the service, "with the hearing and preparation of cases relating to lotteries and the misuse of the mails in the furtherance of schemes to defraud the public," etc.

Having recited the aforesaid regulations the indictment further charges that it was the duty of the said Tyner, if upon investigation of a scheme or plan of business referred to him for investigation it should appear to him that the same was obnoxious to the law, "to report his conclusion and opinion in the premises to the said Postmaster General, with a statement of

the facts upon which such conclusion and opinion were based, together with a recommendation that such fraud order should be issued," etc.   And it is the failure to perform this particular part of his duty which constitutes the gravamen of the charge. The contention of the appellants is that this duty to report with a statement of facts and recommendations, not having been prescribed by the regulations, is nothing but a conclusion of the pleader drawn therefrom, a mere assumption without foundation in any averment of the indictment.

We do not understand the indictment to charge this duty as arising by implication from the terms of the regulation, but as one additional thereto.   The regulation as published charges the officer "with such other like duties as may, from time to time, be required by the Postmaster General."   It was not necessary that there should be an express provision of the law or the regulation promulgated by the department creating such additional duty.   *United States* v. *Macdaniel,* 7 Pet. 1, 14, 8 L. ed. 587, 592.   As was said in that case:   "A practical knowledge of the action of any one of the great departments of the government must convince every person that the head of a department in the distribution of its duties and responsibilities is often compelled to exercise his discretion.   He is limited in the exercise of his powers by the law, but it does not follow that he must show a statutory provision for everything he does.   No government could be administered upon such principles.   To attempt to regulate by law the minute movements of every part of the complicated machinery of government would evince a most unpardonable ignorance on the subject.   Whilst the great outlines of its movements may be marked out and limitations imposed on the exercise of its powers, there are numberless things which must be done that can neither be anticipated nor defined and which are essential to the proper action of the government. Hence of necessity usages have been established in every department of the government which have become a kind of common law and regulate the rights and duties of those who act within their respective limits."

This additional duty is not inconsistent with any provision of

the law, or the regulations made in accordance therewith, but is a reasonable and natural extension of that prescribed in the latter. If, then, such additional duty was imposed in connection with the special reference of the schemes set out in the indictment or by the established usage and practice following such orders made in cases prior thereto, the defendant was under obligation to respect and to obey it with fidelity. Being "required of him," as was said in the case last cited, "by the head of the department, and being a subordinate, he had no discretion to decline the labor and responsibility thus imposed."

Duties imposed by law or regulation promulgated thereunder, and not inconsistent therewith, require no proof. Additional duties that may have been imposed from time to time, by order or direction in the ordinary course of administration of the business of the department, must be proved like other facts. But the direct allegation of the fact in the indictment is all that is required; it is not necessary to set forth the evidence or to negative any theory of the defense. *Stokes* v. *United States,* 157 U. S. 187, 191, 39 L. ed. 667, 668, 15 Sup. Ct. Rep. 617; *Evans* v. *United States,* 153 U. S. 584, 594, 38 L. ed. 830, 834, 14 Sup. Ct. Rep. 934.

What has been said is sufficient also to dispose of the contention on behalf of the defendant, Barrett, the Assistant Attorney, whose duty, as alleged, was to assist his codefendant and superior officer in the premises.

2. To constitute a breach of duty on the part of the defendants in failing to report a conclusion arrived at by them upon the consideration of any scheme referred for investigation and report it is not necessary to allege and prove that the said scheme was within the prohibition of the law. The defendant Tyner was not charged with the issue of the "fraud order;" that was the duty of the Postmaster General, although it is alleged that it was his general practice to issue the same in accordance with the recommendation made in the report, and it is alleged as one of the acts done in furtherance of the conspiracy that formal approval of the special report actually made of the

investigation of the eighty companies was in that way actually had and obtained.

Whenever the matter of the right of the promotor of any scheme to the use of the mails was specially referred to the As-sistant Attorney General, or came into his hands through any official channel, it became his duty to investigate it and report his conclusion thereon, with his opinion and the evidence on which it was based, to the head of the department. If his con-clusion was that the scheme was unlawful, within the provisions of the postal law, it was his duty to make the report as aforesaid and recommend that a "fraud order" be issued.

The duty was to report the conclusion, with the evidence on which it was founded, for the consideration of the Postmaster General and final action by him. · That duty existed without regard to the fact whether the scheme reported on was in fact lawful or unlawful. In either case the duty existed and its faithful performance was required. The discretion reposed in him in respect of the conclusion that he might reach upon an examination ended when that conclusion, whether a sound or un-sound one, had been attained. Having in the exercise of his dis-cretion attained a conclusion, the simple, imperative duty arose of reporting it to the Postmaster General in obedience to his orders or to the settled practice of the office.

3. The next contention is that the averments which contain the charge of the conspiracy are so vague and indefinite as to violate the rule in respect of certainty heretofore stated.

Having affirmed the sufficiency of the averments of the official duty imposed upon the defendant Tyner, we discover no lack of certainty in respect of time, place, and circumstance in the charge of the corrupt conspiracy to prevent the performance of that duty. Having, as averred, reached a conclusion in each of the cases under investigation which rendered that duty impera-tive, the charge is that the defendants conspired not to discharge the same, but, instead, to substitute a general opinion artfully planned to secure each of the said companies in the unobstructed use of the mails, until, at least, the expiration of defendant Bar-rett's official connection with the department, and to secure for

him thereafter employment by the interested parties, and the collection of large sums of money as fees.

4. The next question for consideration is whether the indictment in one of the cases (No. 1397) is fatally defective in that the purpose of the conspiracy as averred was to cause the defendant Tyner to commit the offense of misconduct in office.

The failure of the defendant to perform his official duty under the circumstances and for the reasons charged is sufficient to support an indictment for official misconduct as an offense by the common law. Whether an indictment for the common-law offense should charge that the misconduct was wilful, malicious, or corrupt, we need not stop to inquire, for the indictment is not for that offense but for conspiracy under the statute.

There is, however, no statute of the United States creating the offense of official misconduct, wherefore it is contended that the indictment is fatally defective because there are no common-law offenses against the United States. *United States* v. *Eaton,* 144 U. S. 677, 36 L. ed. 591, 12 Sup. Ct. Rep. 764, and cases cited. Undoubtedly this is the general rule, but it does not apply in the District of Columbia. *De Forest* v. *United States,* 11 App. D. C. 458, 465.

In that case the appellant was charged with keeping a bawdy house in the District of Columbia, and his conviction was affirmed, although there was no statute creating such an offense. The reasons for the conclusion that the conditions existing in the District raised an exception to the general rule were stated as follows by Mr. Justice Morris, who delivered the opinion of the court: "As against the United States regarded as coextensive with the Federal Union of States and operating within the territorial limits of the States, it is undoubtedly true that there are no common-law offenses, for the jurisdiction there given to the United States by the Federal Constitution is distinctly and expressly restricted to the powers enumerated in the Constitution. But the statement was not intended to have application to the District of Columbia. . . . At the time of the cession of the territory of Columbia by the State of Maryland to the Federal Union its law, as well as that of the rest of the States,

was the common law of England, both civil and criminal, so far as that common law was suited to our condition and was unaffected by statute. And with the common law the State of Maryland had adopted a considerable part of the statute law of England. When by the act of February 27, 1801 (2 Stat. at L. 103, chap. 115), the Congress of the United States finally accepted the cession and assumed jurisdiction over the ceded district, it was specifically provided 'that the laws of the State of Maryland, as they now (then) exist, shall be and continue in force in that part of the said district which was ceded by that State to the United States and by them accepted.' · This express enactment, if any such enactment was needed at all, was amply sufficient to continue in force and to perpetuate to the present day in the District of Columbia the common law of England as it existed in Maryland at that time, with all the existing statute legislation of the State and all the statute legislation of England that had been adopted by Maryland. And upon that theory of the law we have been conducting our affairs for nearly a hundred years. It is very true that much of the criminal branch of our common law has either become obsolete or has been obliterated by statutory enactment upon the same subject. Nevertheless, it is true that where it has not been repealed by express statutory provisions, or modified by inconsistent legislation, or where it has not become obsolete or unsuited to our Republican form of government, the common law of England in all its branches, both civil and criminal, remains to-day the law of the District of Columbia, and it has been repeatedly so held. See *United States* v. *Watkins,* 3 Cranch C. C. 441, Fed. Cas. No. 16,649; *United States* v. *Marshall,* 6 Mackey, 34; *United States* v. *Hale,* 4 Cranch C. C. 83, Fed. Cas. No. 15,279. The case of *United States* v. *Eaton,* therefore, is not applicable to the District of Columbia, and was not intended to be applicable to it. And we are of opinion that it was not within the purview of that case to hold that there can be no common-law offenses against the United States in the District of Columbia."

The common law being in force in the District of Columbia when Rev. Stat. § 5440 (U. S. Comp. Stat. 1901, p. 3676), was

enacted, any common-law offense not repealed, superseded, or plainly inconsistent with existing legislation or necessarily obsolete must be held to be an offense against the United States within the meaning of that section. Congress must be presumed to have known then that official misconduct was punishable in this District as an offense against the United States, and yet it evinced no intention to exclude it from the operation of the conspiracy statute, nor is such intention to be found in any subsequent legislation. It is not to be inferred from the fact, upon which the appellants rely, that it is not an offense against the United States when committed by a Federal officer in any of the States of the Union, and possibly not also when committed in any territory, or in any other ceded district under the exclusive jurisdiction of the United States. Criminal laws enforceable in the various courts established by the authority of the United States are not required to be uniform throughout the territories and districts under their control, whether within or without the restrictions of the Constitution.

Good reasons might be given why an act unpunishable in one territory or district should be made criminal in another, or if criminal in all, should be made punishable in a different way in each.

As a matter of fact, we know that it has not been the policy of the United States to subject their different territories and districts to one uniform system, civil or criminal. At one time before the act of retrocession to Virginia the common law and statutes of that State prevailed in one part of this District, whilst those of Maryland governed in the other. The District now has its criminal code supplementing the common law and the general legislation of Congress applicable therein. Alaska has its separate criminal code; the Indian Territory, Oklahoma, and, perhaps, others, have systems of their own.

If it be true that misconduct in Federal office is nowhere a crime, save when committed in the District of Columbia, the condition is rather to be attributed to oversight on the part of the Congress than accepted as evidence of its intention that it shall no longer be held criminal therein.

D. C.]                    Opinion of the Court.

It may be added that this view is not affected by the fact that misconduct in office is but a misdemeanor at common law, whilst the conspiracy to commit it, by reason of the character of the penalty prescribed, becomes an infamous offense. *Clune* v. *United States,* 159 U. S. 590, 595, 40 L. ed. 269, 271, 16 Sup. Ct. Rep. 125.*

5. The indictment in the next case (No. 1396) is specially objected to on the ground that it does not show a conspiracy to defraud the United States. The contention is that to defraud the United States means to deprive them of something of value—to do them a pecuniary injury. We have heretofore denied this restricted meaning to those words. *Palmer* v. *Colladay,* 18 App. D. C. 426, 433. That was an appeal in a habeas corpus proceeding to obtain release from custody had by the order of a commissioner holding the petitioner to bail on a charge of forgery under Rev. Stat. § 5418 (U. S. Comp. Stat. 1901, p. 3666). The affidavit before the commissioner charged the petitioner with forgery in an attempt to defraud the United States through a false paper writing presented to the Civil Service Commission. After discussing the forgery sections briefly it was said that the acts of the parties would probably amount to a conspiracy to defraud the United States. The opinion of the court was delivered by Mr. Justice Barnard, of the supreme court of the District, who took the place of the absent Chief Justice. On this point he said: "It is claimed by appellee that to defraud the United States must mean to deprive it of money wrongfully, or of something of money value; and that a falsehood or trick by which its officers are deceived in the matter of selecting those who are to perform work for it, could not be a fraud against the United

---

*Note by the Court, filed April 26, 1904:

We failed to observe before this opinion was filed that Congress had specially recognized the continued existence of common-law offenses in the District of Columbia, by providing a uniform punishment therefor in § 910 of the new Code, which reads as follows:

"Sec. 910. *Punishment for offenses not covered by provisions of Code.*— Whoever shall be convicted of any criminal offense not covered by the provisions of any section of this Code, or of any general law of the United States not locally inapplicable in the District of Columbia, shall be punished by a fine not exceeding one thousand dollars or by imprisonment for not more than five years or both."

States. We do not agree to this proposition. . . . If false-hoods are imposed upon the persons charged with the duty of ascertaining these qualifications, and made to take the place of facts, then the United States is defrauded, is deprived by deceit of the knowledge justly due to its officers in the proper dis-charge of its business, and it is thereby liable to obtain a less efficient employee." See also *United States* v. *Bunting,* 82 Fed. 883 ; *United States* v. *Curley,* 122 Fed. 738.

The statute, it will be remembered, denounces a conspiracy to defraud the United States *in any manner or for any purpose,* thereby expressly indicating an intention to give the word its broadest and most comprehensive signification. "Although a penal statute is to be construed strictly, the courts are not to dis-regard the plain intent of the legislature. Among other things it is well settled that a statute which is made for the good of the public, ought, although it be penal, to receive an equitable con-struction." *People* v. *Bartow,* 6 Cow. 290. See also *Northern Securities Co.* v. *United States,* 193 U. S. 197, 48 L. ed. 679, 24 Sup. Ct. Rep. 119, and cases there cited.

To defraud means, not only to deprive or to withhold from one that which justly belongs to or is due him, but also to de-prive him of any right by artifice or wrong practised upon him.

In its equitable sense, fraud, says Mr. Justice Story, "proper-ly includes all acts, omissions, and concealments which involve a breach of legal or equitable duty, trust, or confidence justly reposed, and are injurious to another, or by which an undue and unconscientious advantage is taken of another." 1 Story, Eq. Jur. § 187.

The Postoffice Department is charged with the perform-ance of a great public service in which the people of every State, territory, and district are vitally interested.

The complete enjoyment of the benefits and advantages of this public service, as well as the prevention of evils that utilize the mails for their dissemination, depends upon the integrity and efficiency of the administration of the affairs of the Postoffice Department, particularly at its head in the city of Washington.

Any wilful or corrupt misconduct on the part of an official of

the department that operates to impair this administration works a wrong to the United States and does them some substantial injury. The injury may be pecuniary, that is to say, one whereby public money or property may have been taken, destroyed, or expended, but it may also be one the general damage resulting from which may be most serious and far reaching, and yet not of a specific character susceptible of certain ascertainment and pecuniary compensation.

Of this latter kind is the injury embraced in the charges of this indictment, and we are of the opinion that it is within the comprehension of the statute which makes punishable a conspiracy, not only to defraud the United States but to defraud them in any manner or for any purpose.

For the reasons given the order in each case must be affirmed. And it is so ordered.                              *Affirmed.*

[The appellants were subsequently tried in the lower court upon the indictments here sustained, and were acquitted by the verdict of the jury.—REPORTER.]