# CRAWFORD v. UNITED STATES.

CERTIORARI TO THE COURT OF APPEALS OF THE DISTRICT OF
COLUMBIA.

No. 92. Argued October 13, 14, 1908.—Decided February 1, 1909.

An agreement by an official of the United States under which he secretly
receives any portion of what is paid for supplies furnished on his requi-
sition is one to defraud the United States within § 5440, Rev. Stat.

An indictment which sets forth the details of a corrupt contract be-
tween defendant and a government official by which, from its na-
ture, the Government would be defrauded, is sufficient to sustain a
charge of conspiracy under § 5440, Rev. Stat., even if it does not
allege in what particular manner the conspirators intended to de-
fraud the United States.

In criminal cases courts are not as exacting in regard to the character of
objections as in civil cases, and will notice error in the trial of a crimi-
nal case although the question may not have been raised in exactly the
proper manner at the trial. *Wiborg v. United States*, 163 U. S. 632.

Where defendant was on trial for conspiracy under § 5440, Rev. Stat.,
an objection to a juror on the ground that he was a salaried official of
the United States held in this case to reach to the qualifications of
the juror by reason of his relations with the Government although he
was not a salaried officer thereof.

The common law in force in Maryland on February 27, 1801, remains in
force in the District of Columbia except as inconsistent with statutes
subsequently enacted.

Under the common law one is not a competent juror who is master,
servant, steward, counsellor or attorney of either party, and statutory
provisions of qualifications, not inconsistent with this rule, do not
strike it down.

In the District of Columbia jurors must, at least, have the qualifications
stated in § 215, and are exempt under § 217 of the Code, but these
sections are not inconsistent with, or exclusive of, the common-law
rule that one in relation with either party is incompetent.

Bias disqualifies a juror, and bias is implied in the relation between em-
ployer and employé and actual evidence thereof is unnecessary.

An employé of the United States is not competent as a juror where defendant is on trial for conspiracy against the United States under § 5440, Rev. Stat.

Where a letter written to defendant is admitted in evidence for the purpose of showing the moral character of defendant and that he had endeavored to destroy evidence in the writer's hands so as to prevent its being used against him on the trial, the answer immediately written should also be admitted, whether written by defendant or his counsel under his direction; and defendant's own evidence in regard to the matter alleged is admissible so as to disclose the whole transaction.

There is a presumption of harm caused by errors in regard to the admission or exclusion of evidence in a jury trial which requires the reversal of the judgment unless the record clearly shows the absence of harm.

The extent to which the law officers of the Government will use evidence of persons already convicted of the crime of conspiracy for which defendant is also indicted, is within their discretion, and their action will not be reviewed by the courts; but the evidence of such witnesses is to be received with caution and suspicion, and is not entitled to the same credence as that given to ordinary witnesses.

In considering whether error in excluding defendant's evidence in a criminal trial is reversible it is not enough that inferences favorable to defendant might have been drawn from some of the admitted testimony, he is entitled to state directly on oath facts that are relevant.

While a book of accounts may be inadmissible as evidence so far as it relates to accounts between the parties it may be admissible as written corroborative evidence, and as part of a transaction, to be submitted to the jury for what it is worth.

30 App. D. C. 1, sustained as to sufficiency of indictment and reversed on other points.

On the third of April, 1905, in the Supreme Court of the District of Columbia, the defendant was indicted, together with George E. Lorenz and August W. Machen, for a conspiracy to defraud the United States, by means stated in the indictment, and in relation to a contract between the Postal Device and Lock Company, a corporation of the State of New Jersey, and the Post Office Department of the United States, by which the company was to furnish certain satchels to the department for the use of the letter carriers in the free-delivery system of the Government.

The indictment was founded upon § 5440 of the Revised Statutes of the United States, 3 Comp. Stat., page 3676, which reads as follows:

"If two or more persons conspire either to commit any offense against the United States, or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, all the parties to such conspiracy shall be liable to a penalty of not more than ten thousand dollars, or to imprisonment for not more than two years, or to both fine and imprisonment in the discretion of the court."

Nearly two years before the finding of this indictment (viz.: in July, 1903), the defendant had been indicted in the same court by two different indictments, relating to the same general subject-matter as the one found in April, 1905, one indictment charging him with conspiring (together with Lorenz and Machen) against the United States, by agreeing to present false bills of account to the Post Office Department, in relation to the contract mentioned, for supplying the department with satchels for letter carriers, in alleged violation of § 5438 of the Revised Statutes, 3 Comp., Stat. p. 3674. The other indictment was against the defendant individually for presenting false claims to a clerk in the Post Office Department under this same contract, and in violation of the same section of the Revised Statutes. Upon motion the three indictments were consolidated for the purpose of the trial of the defendant and were tried together, a severance in the conspiracy indictments having been granted upon the defendant's motion for his separate trial. The two indictments found in 1903 have been so disposed of in the court below that no question arises in regard to either.

Upon the trial the defendant was convicted, as hereinafter more particularly stated, and he then appealed from the judgment entered upon the verdict of conviction to the Court of Appeals of the District, where it was affirmed by a divided court, Mr. Chief Justice Shepard dissenting. 30 App. D. C. 1.

Upon application of the defendant this court granted a writ of certiorari, and the case is now here by virtue of that writ.

*Mr. A. S. Worthington* for petitioner:

That part of § 5440 which refers to conspiracies to defraud the United States cannot be held to apply to a case where an official without wrongful intention is found in a position where his personal interest is in conflict with his duty to the Government. Criminal statutes must be strictly construed and so that it may be known in advance to what classes of acts they extend. *United States* v. *Wiltberger,* 5 Wheat. 76; *United States* v. *Brewer,* 139 U. S. 278; *Todd* v. *United States,* 158 U. S. 278, 282; *France* v. *United States,* 164 U. S. 676, 682, 683; *Neal* v. *Clark,* 95 U. S. 704; *United States* v. *Britton,* 108 U. S. 199; *Spring Co.* v. *Knowlton,* 103 U. S. 49.

The juror Haley, who was challenged for cause, being in the employ of the United States, was disqualified and should not have been allowed to serve. 3 Blackstone Comm., 363; 1 Chitty, Crim. Law, 541, 542; 1 Bishop, New Crim. Procedure, § 902; *Block* v. *State,* 100 Indiana, 357; *State* v. *Berry,* Busbee, 330; *Mitchell* v. *Railroad Co.,* 63 Georgia, 173; *Atlantic Coast Line R. Co.* v. *Bunn,* 58 S. E. Rep. 538, 539; *Hubbard* v. *Rutledge,* 57 Mississippi, 6; *Louisville &c. R. Co.* v. *Mask,* 64 Mississippi, 738; *Railway Co.* v. *Cook,* 37 Nebraska, 435, 437; *N. P. R. Co.* v. *Herbert,* 116 U. S. 642.

The trial court committed a prejudicial error by allowing the prosecution to prove as part of its case in chief that the defendant had taken away from the office of the Fabrikoid Company certain letters and refusing to allow the defendant to explain why he took them, or what he did with them, and in allowing the prosecution to put in evidence Aspinwall's letter to Crawford charging the latter with abstracting a part of the files of the Fabrikoid Company and refusing to allow the defendant to offer in evidence the reply to that letter written at Crawford's request by his counsel.

The trial court should have allowed the defendant to intro-

duce in evidence the entries in his account book from page 24 to page 31, and certainly to exhibit to the jury the specific entries in that book relating to his financial transactions with Lorenz in connection with the contract of June 25, 1902, between the Postal Device and Lock Company and the Post Office Department.

*The Attorney General* and *Mr. Holmes Conrad,* Special Assistant to the Attorney General, with whom *The Solicitor General* was on the brief, for the United States:

The facts charged, without more, constitute a fraud on the Government and are sufficient to show that the official action of the officer in question was influenced by the agreement. *Wardell* v. *Railroad Co.,* 103 U. S. 658.

A conspiracy is sufficiently described as a combination of two or more persons, by concerted action, to accomplish a criminal or unlawful purpose, or some purpose not of itself criminal or unlawful, by criminal or unlawful means. *Pettibone* v. *United States,* 148 U. S. 203. The indictment charges that each of the acts done by the defendants, and by either of them, was done in pursuance of the unlawful agreement, and was done to defraud the United States.

It is not material to the offense charged that the United States should have been injured thereby. *Hyde* v. *Shine,* 199 U. S. 81.

The juror Haley was not a salaried officer of the Government and was therefore not disqualified. *United States* v. *Smith,* 124 U. S. 532; *United States* v. *Barber,* 21 D. C. 456. Even were Haley held to be in the employ of the United States, that fact would not disqualify him. The common-law qualifications of a juror are not in force in the District of Columbia. Congress has, by statutory enactment, prescribed the qualifications of jurors in the District and among those qualifications there does not appear the common-law feature of servant or even employé. Code, D. C., §§ 215, 217. The common law must be held to have been replaced by the two sections above quoted.

The trial court committed no error in refusing to admit the

letter written by defendant's counsel to Aspinwall.   The trial court alone has discretionary power to determine the order in which the proof in a case shall be admitted, and it is no abuse of such discretion to hold that the defendant shall not introduce his evidence until the prosecution has, in regular order, offered its evidence.   The court also properly excluded the proffered explanation by the defendant as to his motive in taking the letter from Aspinwall's files.   Wharton on Evidence, § 35; *Ibid,* 482.

MR. JUSTICE PECKHAM, after making the foregoing statement, delivered the opinion of the court.

The defendant was convicted on the first count of the indictment found in April, 1905 (which contained six counts), and was acquitted on the fifth and sixth counts.   The court having previous to the trial sustained a demurrer to the second, third and fourth counts, there is nothing left under this indictment except the conviction of defendant on the first count, and the question to be considered at the outset is as to the sufficiency of that count.   The grounds of the demurrer were that the indictment did not set forth any offense under § 5440 of the Revised Statutes of the United States, nor did it set forth any offense under any statute, or at common law; that as to the first count, it did not appear how the Government could have been defrauded by the alleged scheme of conspiracy, and that it is not alleged in the indictment that any payment to Machen under the agreement set forth in the count was intended to influence Machen's official action, and it is not alleged that the Government was to pay more than it would have had to pay if the alleged agreement between the defendants had not been entered into, and it is not alleged that the contract was not honestly awarded.   These questions may be considered, notwithstanding the defendant, when his demurrer was overruled, pleaded over and went to trial on the plea of not guilty.   See Code of District of Columbia, § 1532, p. 300.

Without going into any very great detail, it is necessary to state' what in substance is alleged in the first count.  It is therein averred that Machen (one of the alleged conspirators) was the General Superintendent of the Division of Free Delivery of the Post Office Department of the United States, and that the department used satchels for letter carriers, which were supplied by contract, at a certain price named therein for each satchel, and in such numbers as the department might, from time to time, require.  It was the duty of the General Superintendent to keep the department advised from time to time of the approaching expiration of existing contracts for furnishing supplies, and of the necessity for advertising for bids for contracts for the furnishing of supplies, including satchels for letter carriers, and also to advise as to the matter and form of such proposed contracts, and it was his duty to use his best and honest judgment as to the number of satchels that from time to time might be required for the use of the carriers under any contract that might be made.  It was his duty to examine the bills for such of the satchels as had been delivered and approve them if correct, upon which payment would be made, in due course, by the Post Office Department.  The defendant and Lorenz knew fully the duties pertaining to the office of General Superintendent prior to the making of the contract mentioned.

On the sixth of May, 1902, on the advice of the General Superintendent, the department advertised for the presentation to the department of bids up to June 6, 1902, for the supplying of satchels for letter carriers for four years from July 1, 1902.

On June 3, 1902, the defendant and Machen and one Lorenz, intending to defraud the United States, unlawfully and fraudulently conspired, "knowingly, wrongfully and corruptly to defraud the United States in a dishonest manner, and through and by means of a dishonest scheme and arrangement," which is then stated.  The defendant was to procure the lock company, of which he was an officer, and which was a New Jersey

corporation desiring to engage in furnishing supplies to the Post Office Department, to put in a bid for furnishing satchels for the department. He was also to procure the lock company, before the offer of the bid of the company to the department, to make a contract with Lorenz that if the bid of the lock company was accepted by the department, then whenever the lock company furnished any satchels to the department under such contract and received from the department payment therefor, the lock company would pay to Lorenz all of such amount exceeding the cost of manufacturing and delivering the same and twenty-five cents for each satchel. Pursuant to such agreement the lock company did enter into such a contract with Lorenz.

On June 3, 1902, the defendant and the General Superintendent and Lorenz, as part of their dishonest scheme, agreed that the money which was to be paid to Lorenz by the lock company should thereafter be divided between the defendant, the General Superintendent and Lorenz, in certain proportions unknown to the grand jury.

On the twenty-fifth of June, 1902, the United States, through the Postmaster General, made a contract with the lock company, by which the former agreed to purchase from the lock company at certain fixed prices so many satchels as might be needed by the department for four years from July 1, 1902.

On October 3, 1902, the defendant, in order to effect and carry out the conspiracy, presented a bill against the United States for $15,800, for five thousand satchels theretofore sold and delivered to the department, in accordance with the contract of June 25, 1902, with the lock company, and on October 13, 1902, in pursuance of the conspiracy the General Superintendent approved the bill as such Superintendent, the defendant receiving and accepting a warrant payable to the order of the lock company from the department, in payment of such bill for the amount thereof.

On the twenty-first of October, 1902, the defendant, in pursuance of the conspiracy, drew a check of the lock company

upon Spencer Trask & Company, of New York, for $5,441.36, payable to the order of Lorenz, which he sent to Lorenz.

On October 28, 1902, Lorenz having received the check and obtained the money on it, sent to Machen, the General Superintendent, the sum of $900, by means of a draft procured by Lorenz, and sent by him to the Superintendent.

From this statement it appears that the count discloses the duties of the General Superintendent and the duty that he owed to the Government in relation to a contract of the nature above mentioned. It was part of his duty to give an honest and unprejudiced judgment, whether the contract was from time to time being fairly and fully complied with, both as to the number of satchels furnished, their material and workmanship, as well as with regard to all other matters pertaining to the contract. It cannot be supposed that such duty could be fully, impartially and honestly discharged by an officer who, by reason of his private and alleged corrupt agreement with the agent of the contractor whose work he was supervising, would obtain more pay by exceeding in his requisitions the number of satchels really necessary for the department. It could scarcely be believed that he would give an unbiased and honest judgment upon the question whether the contract had been fulfilled as to material or workmanship or other detail, when, if the satchels were received, he would at once, though secretly, receive a certain portion of the sum paid by the department to the contractor for furnishing such satchels. This is not an indictment for the violation of a statute against bribery. It is for a conspiracy to defraud the United States, and when it is seen that the conspiracy consists in such a corrupt agreement as is alleged in the indictment, by which an officer of the United States is, in substance, to have a secret interest in a contract as to the fulfilling of which by the contractor that officer is to be the judge, it becomes unnecessary to aver that the interest was given him, or the money paid to him to influence his official conduct upon the very contract in question. The agreement is alleged to have been an unlawful

and fraudulent one, wrongfully and corruptly to defraud the United States. Its almost necessary result, if carried out, would be to defraud the United States. The fraud might be perpetrated by getting the contract at a higher price than otherwise would have been obtained, or, if already obtained, then the United States might be defrauded by the General Superintendent accepting improper satchels, not made of the materials, or in the manner specified in the contract, or by his requiring the delivery of more satchels than were sufficient for the wants of the department. It is not necessary in such a case as this (of an alleged unlawful and corrupt contract) to allege in the indictment which, of the various ways the Government might be defrauded, was in the minds of the conspirators, or that they all were. *Dealy* v. *United States*, 152 U. S. 539, 543. Such a corrupt agreement, if carried out, would naturally, if not necessarily, result in defrauding the United States by causing it to pay more for satchels than was necessary, or for more satchels, or possibly inferior ones, than it otherwise would, but for the corrupt agreement set forth. The indictment was sufficient. *United States* v. *Hirsch*, 100 U. S. 33; *Hyde* v. *Shine*, 199 U. S. 62, 82; *United States* v. *Keitel*, 211 U. S. 370.

Various questions arose upon the trial of the case, to some of which we will now refer.

In the course of empannelling the jury one John C. Haley was called as a juror and sworn upon his *voir dire*, and testified that he was a druggist; that he did not know the defendant; that he had formed no opinion about the case; that his drug store was a subpostal station, and that he was the clerk in charge; that he was technically a clerk of the city post office, and that he was paid an annual compensation of $300, which included all clerk hire and rental of the premises; that he was paid for the entire service of taking charge of the substation, and whatever rent may be necessary; that it is one of the things in connection with the drug business that can hardly be avoided; that a drug store, to keep up its prestige, must sell

postage stamps, and might as well get paid for it as to do it for nothing. The counsel for the defendant then challenged Haley for cause, the objection stated being that he was a "salaried officer of the Government;" but the court overruled the challenge, to which ruling the defendant duly excepted. During the organization of the jury the defendant exhausted the peremptory challenges allowed him by law, and Haley sat as a member of the jury that tried the case.

The question is, Was Haley disqualified to sit as a juror, and did the court err in holding that he was not? Section 215 of the Code of Laws for the District of Columbia, page 49, provides as follows:

"SEC. 215. QUALIFICATIONS,—No person shall be competent to act as a juror unless he be a citizen of the United States, a resident of the District, over twenty-one and under sixty-five years of age, able to read and write and to understand the English language, and a good and lawful man, who has never been convicted of a felony or a misdemeanor involving moral turpitude."

Section 217 provides that "all executive and judicial officers, salaried officers of the Government of the United States and of the District of Columbia . . . shall be exempt from jury duty, and their names shall not be placed on the jury lists." Counsel for the Government contend that the objection by defendant's counsel to the juror Haley was founded, as shown by the record, on the ground that the juror was a "salaried officer of the Government;" that the juror was not such an officer, and that if he were, that fact is only ground for a claim on his part for exemption (which he did not make), and not a ground for disqualification. Even though the juror was not a salaried officer of the Government, under *United States* v. *Smith*, 124 U. S. 525, which was founded upon a statute concerning a very different subject, and as to which different reasons might apply, and even though such an officer was only exempt under § 217, and not disqualified under § 215, yet we are of opinion that the objection actually made reaches beyond the mere question

whether technically the juror was or was not a salaried officer
of the Government, and that it reaches the question of the
qualification of a juror by reason of his relations to the Gov-
ernment as a post office clerk or employé, in a subpostal station,
and whether such relations did not by law disqualify him from
acting as a juror in an action to which the Government was a
party. The objection to the juror was evidently by reason of
his relations to the Government, however described.

In criminal cases courts are not inclined to be as exacting,
with reference to the specific character of 'the objection made,
as in civil cases. They will, in the exercise of a sound discre-
tion, sometimes notice error in the trial of a criminal case,
although the question was not properly raised at the trial by
objection and exception. *Wiborg v. United States,* 163 U. S.
632, 659.

Under this rule the general character of the objection to the
juror was fairly before the court, and therefore we think it
proper to notice the alleged error in the reception of this
juror and to decide it with respect to the general qualification
of the juror under the law, without being tied down to the
question of whether he was a salaried officer and so exempt,
but not, as is contended, thereby disqualified to serve as a
juror.

The question as to the qualifications of a juror in this Dis-
trict is not in all cases a mere local one. If the objection is not
based alone upon the wording of the section of the code above
cited, but also upon the common law, it becomes an important
question which might arise anywhere in the whole country.
There may be statutes in the different States as to qualifications
of jurors which in their construction would not prevent the
application of the common law in regard thereto, and so the
question of qualification being the same in the Federal as in
the state courts (Rev. Stat., § 800; 1 Comp. Stat., p. 623), may
be a general one. It is of special importance in this District,
where there are so many thousands of clerks and employés
of the Government, to know whether they are qualified jurors

to sit on the trial of cases to which the Government is a party. If they be so qualified it might not be cause for much astonishment to see in this District a majority of a jury composed of such jurors.

Taking the contention of the Government to be sound, the fact that a proposed juror is a salaried officer of the Government can only be ground for his own claim of exemption, which, if not made by him, leaves him a competent juror. A jury composed of Government employés where the Government was a party to the case on trial would not in the least conduce to respect for, or belief in, the fairness of the system of trial by jury. To maintain that system in the respect and affection of the citizens of this country it is requisite that the jurors chosen should not only in fact be fair and impartial, but that they should not occupy such relation to either side as to lead on that account to any doubt on that subject. We do not think that § 215 of the code of the District includes the whole subject of the qualifications of jurors in that District. If that section, together with § 217, were alone to be considered, it might be that the juror was qualified. But, by the common law, a further qualification exists. If that law remains in force in this regard in this District a different decision is called for from that made in this case. The common law in force in Maryland, February 27, 1801, remains in force here, except as the same may be inconsistent with or replaced by some provision of the code for the District. Code, § 1, chap. 1, p. 5. It has not been contended that the common law upon the subject of jurors was not in force in Maryland at the above-named date, or that it did not remain in force here, at least up to the time of the passage of the code. Jurors must at least have the qualifications mentioned in § 215, but that section does not, in our opinion, so far alter the common law upon the subject as to exclude its rule that one is not a competent juror in a case if he is master, servant, steward, counsellor or attorney of either party. In such case a juror may be challenged for principal cause as an absolute disqualification of the juror. 3 Blackstone (Cooley's),

4th ed., page 363; *Block* v. *The State,* 100 Indiana, 357, 362. In the Indiana case, Judge Niblack, speaking for the Supreme Court of that State, held in substance in accordance with the above rule of the common law, and that the Indiana statute upon the qualifications of jurors did not strike out the rule of the common law on the subject, when not inconsistent with the statute. This rule applies as well to criminal as to civil cases. Mr. Chief Justice Shepard, in his dissenting opinion in this case, cites many cases to the effect that a clerk or employé of a private party or of a corporation is not qualified to sit as a juror in such a case, over the objection of the opposite side. Although the cases cited were civil cases and rest mainly on the common law, they are not lessened in weight on that account. On the contrary, they apply with added weight to criminal cases. Modern methods of doing business and modern complications resulting therefrom have not wrought any change in human nature itself, and therefore have not lessened or altered the general tendency among men, recognized by the common law, to look somewhat more favorably, though perhaps frequently unconsciously, upon the side of the person or corporation that employs them, rather than upon the other side. Bias or prejudice is such an elusive condition of the mind that it is most difficult, if not impossible, to always recognize its existence, and it might exist in the mind of one (on account of his relations with one of the parties) who was quite positive that he had no bias, and said that he was perfectly able to decide the question wholly uninfluenced by anything but the evidence. The law therefore most wisely says that with regard to some of the relations which may exist between the juror and one of the parties, bias is implied, and evidence of its actual existence need not be given.

The position of the juror in this case is a good instance of the wisdom of the rule. His position was that of an employé who received a salary from the United States, and his employment was valuable to him, not so much for the salary as for the prospect such employment held out for an increase in his business

from the people who might at first come to his store for the purchase of stamps, etc.   It need not be assumed that any cessation of that employment would actually follow a verdict against the Government.   It is enough that it might possibly be the case, and the juror ought not to be permitted to occupy a position of that nature to the possible injury of a defendant on trial, even though he should swear he would not be influenced by his relations to one of the parties to the suit in giving a verdict.   It was error to overrule the defendant's challenge to the juror.

Upon the trial of the case the Government called as a witness John Aspinwall, who was the president of the Fabrikoid Company of Newburg, New York, and it appeared from his testimony that some time in 1902, and prior to the making of the contract between the lock company and the Post Office Department, the defendant had some correspondence with the Fabrikoid Company with reference to the availability and the cost of the material manufactured by that company for use in the manufacture of satchels to be used by the Post Office Department for letter carriers.

After the finding of the two indictments against the defendant, and some time in the latter part of 1903, the defendant visited the place of business in Newburg, New York, of the Fabrikoid Company, and requested the privilege of looking over the correspondence between himself and that company. For the purpose of proving what the Government asserted was a suppression or spoliation of evidence, the witness testified that the defendant was permitted to look over the files in the company's letterbooks and examine his letters to the company, and copies of its letters to him, the witness not being present when the defendant made such examination.   Subsequently the witness discovered that a copy of a letter that the company had written to the defendant and dated April 21, 1902, had been removed from the copybook, and the index covering that letter had been erased.   The letterbook was then produced by the witness from which the copy letter had been removed, and

it was exhibited to the jury by counsel for the Government. Counsel for the defendant thereupon admitted that the defendant took the copy letter from the letterbook and made the erasure of the reference to the page, and the witness identified the letter then produced as the original which had been taken from the letterbook of the witness. The witness also identified a letter dated April 18, 1902, as a letter which he testified he had received from the defendant, and which counsel for defendant admitted defendant had taken at the same time he had taken the copy letter from the copybook. Counsel for the Government then read in evidence to the jury the letter from defendant of April 18, and also the letter from the witness dated April 21, replying thereto, which had been removed from the letterbook of witness's company. The Court of Appeals has held that both letters were in fact harmless, and that their contents would tend to negative the existence of any sinister intent of defendant in taking them. But evidence as to the intent of defendant in taking them was certainly proper, as is hereafter stated.

The witness Aspinwall further testified that when he discovered the loss of the letters he wrote to the defendant the letter dated December 7, 1903. Counsel for the defendant then admitted that he had the original of that letter, but stated that the witness might read it from his copybook. The letter was then read, in which the witness charged the defendant, in substance, with having surreptitiously removed from the files of the company a copy of the letter from the company to the defendant, and with having erased the page from the index. The letter of December 7 was then offered in evidence without objection.

As soon as the letter was admitted in evidence the counsel for the Government immediately offered the letter written by counsel for defendant in answer to it, but was stopped by the court with an inquiry as to its relevancy, which he answered by stating that he did not see its relevancy. The court observed he would hear from whoever offered the letter as to its

relevancy, when counsel for Government said he did not desire to offer the letter, and that he had only offered it at the suggestion of counsel for defendant, who then moved to strike out the letter just received in evidence (that of December 7), on the ground that it was inadmissible unless coupled with the answer that might have been made to it. The court held that the letter from defendant's counsel could not be considered by the jury, but that the letter written by the witness Aspinwall to defendant was relevant as tending to prove that the defendant was charged by that witness with abstracting the letter from the files. The motion to strike out was denied, and the counsel for the Government then said that he did not offer the answer to the letter, which was accordingly not received in evidence. To obviate an objection that the defendant had no right to offer evidence while the case was with the Government, the defendant subsequently, when the case was with him, offered in evidence the letter written by his counsel, which on objection was ruled out.

It is plain that the letter from the witness Aspinwall to the defendant, making the charge that defendant took the letters, as above stated, was put in evidence by the Government for the purpose of endeavoring to show that the defendant had surreptitiously taken evidence which might possibly be used against him upon his trial. The response of defendant to such letter should have been admitted as explanatory of the letter of accusation. Without the letter of explanation the other letter should not have been received. The Court of Appeals held that it was difficult to understand the theory upon which the letter from Aspinwall to defendant was admissible, but as it was admitted, without objection, there was no error, and the subsequent motion to strike out the letter was addressed to the discretion of the trial court. It seems clear from the record that the letter of the witness to defendant was not objected to, under a belief by defendant's counsel, formed possibly upon some prior arrangement or understanding between counsel, that the answer to it would also, at once, be offered in evidence.

Under these circumstances, and in the absence of the offered explanation, the letter of witness, making a charge of abstracting letters, should have been struck out on the motion made by defendant immediately upon the withdrawal of the offer in evidence of the answer to the letter. It was all one transaction, and the reception of the first letter without objection was at once followed up by the Government's offer of the answer, and when the offer was withdrawn it is too strict an enforcement of a general rule to hold that the motion to strike out was addressed to the discretion of the court. But the motion was not denied on any such ground. The record shows it was denied because the court held the letter proper to be put in evidence. The theory stated by the court was a mistaken one. It was wholly immaterial what charge was made by witness in the letter, separate from the action of defendant, in regard to the charge. Defendant was not on trial for abstracting the letter, and the statements therein were alone no evidence against defendant. If the letter were admitted, then the answer to it should also have been admitted. The court seemed to agree that if the answer had been made by the defendant personally, instead of by his counsel, it might have been admissible, but that as defendant did not himself write the answer it could not be admitted. The court stated, when the offer was first made by defendant's counsel to put the answer to the letter in evidence, that it was not proper to offer any of his evidence at that time, while the case was with the Government, but the answer was subsequently offered in evidence by defendant's counsel, when the case was with him, and, under objection, was again rejected. So the defendant had the accusing letter put in evidence against him and was not permitted to have his answer, through his counsel, admitted in reply.

Again, at the close of all the evidence, when counsel for the defendant once more moved to strike out the letter of witness Aspinwall, the court denied the motion on the ground that the evidence was of a nature to throw light on the minds of the jury upon the moral makeup of the individual, and thus enable

the jury to come to a conclusion as to what his sworn word is worth. This reason was repeated in his charge, when the court said that while such evidence did not tend to indicate that the defendant was guilty, it was admitted to enable the jury to take into consideration what was the degree of moral sense that the defendant witness had.

When the letter was first offered and received in evidence on the part of the Government the defendant had not been placed on the witness stand and after he had been on the stand this evidence was retained, while the defendant was not permitted to show what his written answer to the charge of spoliation was, because the answer was written by his counsel (although by his direction and under his authority) and not by himself, personally. An explanation of the reason for his taking the letters might be quite material to enable the jury to come to a decision, as to the moral makeup of defendant, but he was not allowed to fully give it. The Court of Appeals also held that the answer to that letter, concededly written by defendant's counsel, was plainly inadmissible, but that even if its exclusion had been error, it was cured by the fact that the defendant, when on the stand, testified to the same explanation of his action, i. e., that he understood that Aspinwall had consented that he take such of the files as he desired.

We do not think that the letter written by counsel for the defendant was inadmissible. The defendant had in substance testified that it was written by his counsel, with his consent and by his direction. In other words, that counsel was acting simply as the agent and under the direction of his principal, the defendant in the case. It was not necessary that such letter should be written by the defendant personally, in his own handwriting. The importance of the matter lies in the fact that defendant, as soon as the accusation was made, had, through his counsel, acting under his direction explained the charge made of secretly taking evidence which was in the hands of a third party, and which he feared might be used against him. The defendant did on the trial testify to the same

explanation as contained in the letter of his counsel, *i. e.*, that
Aspinwall in substance consented to the taking of the letters,
but it is doubtful if such evidence cured the error of excluding
the letter written at once after the accusation was made and
long before the trial, in which letter he admitted and explained
the taking, showing it was from no desire to suppress evidence,
but, on the contrary, to preserve it.

We are of opinion, also, that the court erred in its refusal to
allow defendant to testify in regard to his intention in taking
the letters from the files. His counsel asked him the question
when he was on the stand, after he had admitted their taking,
whether he took them with the intent to suppress or destroy
them, or with intent that they might be preserved and pre-
sented to the jury when his trial should come on. Counsel
offered to show the fact by the witness and let the witness say
which it was. This was objected to by counsel for the Gov-
ernment and the objection sustained.

The witness was further asked whether when he took the
evidence he had the intention to destroy it. This, upon ob-
jection, was ruled out, as was the question, What did you do
with these letters after you had taken them? Defendant's
counsel then stated: "We offer to prove that the witness then
brought them to his counsel in Washington, Mr. Worthington."
The offer was, on objection, overruled.

The whole bearing of the evidence on the part of the Gov-
ernment in regard to the letters could only have been for the
purpose of contending that the defendant took the letters
without leave and intended to suppress the evidence contained
in them. It was proper to prove the intent of the witness
when he took these letters, whether he took them with the
intent of destroying or suppressing them as evidence against
himself, or whether he took them for the purpose of preservation
and of delivering them to his counsel to be used on his trial.
It was error to reject the evidence, for it was material and
proper to go to the jury. The Court of Appeals so held, and
said: "The intent of the defendant in obtaining possession of

the letters was material, and being material the defendant should have been permitted to testify as to his intent and motive." The court, however, Mr. Chief Justice Shepard dissenting, held that the record showed that this error, in excluding material evidence, did not harm the defendant, and should, therefore, be disregarded by the appellate court.

There is a presumption of harm arising from the existence of an error committed by a trial court against the party complaining, in excluding material evidence on a trial, especially before a jury. It is only in cases where the absence of harm is clearly shown from the record that the commission of such an error against a party seeking to review it is not cause for the reversal of the judgment. *Deery* v. *Cray,* 5 Wall. 795, 807; *Smiths* v. *Shoemaker*, 17 Wall. 630.

The defendant was peculiarly situated in this case, and great care was necessary to prevent injustice to him. The record shows that one of the alleged conspirators, Machen, had just prior to defendant's trial herein pleaded guilty under this same indictment and had been sentenced to imprisonment, to commence upon the expiration of a term of imprisonment he was then serving. He was not called as a witness. While this action of Machen was not the slightest evidence of the guilt of defendant, and was not matter to be referred to or considered by the jury, it left defendant without the aid of Machen in the trial of the case. In addition to that, Lorenz was called as a witness for the Government upon the trial of this defendant, and testified that he was a defendant in the two conspiracy indictments in regard to which this defendant was then on trial, and that he was then serving in the Moundsville Penitentiary a sentence from the Supreme Court of the District. Both of these men might have been guilty of a conspiracy to defraud the United States, and the defendant be innocent thereof. But a felon, being also a confessed accomplice, was thus produced by the Government as a witness for the purpose of proving its case against defendant, the witness having, as it would appear, in popular language, turned "State's evidence,"

at least so far as to incriminate himself together with defendant. Without his evidence it would have been difficult, if not impossible, to convict the defendant. No reflection is intended or intimated with regard to this action on the part of the Government. It was wholly within the discretion of its law officers, and their decision ought not to be reviewed by the court. But the evidence of a witness, situated as was Lorenz, is not to be taken as that of an ordinary witness, of good character, in a case whose testimony is generally and *prima facie* supposed to be correct. On the contrary, the evidence of such a witness ought to be received with suspicion, and with the very greatest care and caution, and ought not to be passed upon by the jury under the same rules governing other and apparently credible witnesses. In many jurisdictions such a man is an incompetent witness unless he has been pardoned. The facts surrounding this case make it particularly important that the rule in regard to material errors should be most rigidly adhered to. If it be not clear that no harm could have resulted from the commission of this material error, the judgment should be reversed. A careful perusal of the testimony, regarded by the court below as sufficient to show that no harm resulted to the defendant on account of this error, has failed to convince us that such is the fact. In the opinion of the Court of Appeals it is said there was no testimony given as to the intent with which defendant took the letters. This was, of course, because such evidence was excluded. The letters were, in fact, subsequently produced by defendant's counsel in court. It is further said, in the opinion, that the defendant was "permitted to testify as to his reason for erasing the index number in the letterbook, and that he did so 'with the idea of putting that,' *i. e.*, the letter from the company, 'back, and making the file perfect.' It is therefore clear that the defendant was permitted to offer testimony, fully meeting the Government's contention that he had taken the letters without the consent of their custodian; further, that on the subject of his intent in taking them he was permitted to offer testimony

from which the only possible inference was that he desired them in order that he might show everything with reference to his transactions with the Fabrikoid Company; and that as to one letter, at least, he was permitted to testify that he took it with the intention of putting it back. To have permitted him to testify, as he offered in addition to the foregoing, that he took them with the intention of showing them to his counsel, would have added little, if anything, to his explanation; indeed, as already stated, such testimony was not directly responsive to that offered by the Government, viz., that he had taken the letters surreptitiously. This latter allegation he was permitted to negative fully and explicitly. It is impossible to conclude that the refusal of the learned trial justice to permit him to testify more fully as to what he intended to do with the letters was prejudicial to his defense."

There may have been testimony some time during the trial, from which inferences might possibly have been drawn as to the motive or intent with which those letters were taken, but, instead of testimony from which such inferences might have been drawn, the defendant was entitled to state directly on oath to the jury what that intention was, and what were the motives which induced him to take the letters.

It is hardly possible to imagine a case where greater care was necessary in regard to the exclusion of proper and admissible evidence than in the case before us. As we have said, it was entirely possible that the jury might believe that both Lorenz and Machen were guilty, as alleged, in the indictment for conspiracy, and that the defendant was, nevertheless, perfectly innocent. No material and proper evidence upon that issue should have been excluded, and the error committed was not, in our opinion, clearly shown to have been harmless.

During the trial, while the case was with the defense, counsel offered in evidence a certain book, which contained entries relating to the financial transactions between defendant and Lorenz, in connection with the contract, dated June 25, 1902, between the lock company and the Post Office Department.

As part of its case, the Government had been permitted to introduce evidence tending to show that Lorenz had paid to defendant some part of the money which Lorenz had received from the lock company, and evidence was given which the Government claimed tended to show that the receipt of these moneys by defendant was concealed from his company.

Spencer Trask had been called by the Government as a witness for the purpose of showing his ignorance of any such payments, and he was asked whether the defendant had ever told him that under this contract with the Government he was to receive a part of the money back from Lorenz, and the witness answered, "Certainly not; absolutely not." It appeared that the witness Trask was a banker in the city of New York, and that he held a controlling interest in the lock company, of which Mr. Chance, his private secretary, was president. He also testified that he did not care to and did not, as a matter of fact, spend time in the examination of the details of the business of the lock company; that he confided it to Mr. Chance and the defendant, and that the president, Mr. Chance, by direction of witness, had the general conduct of the company under his control.

The question whether the defendant had received money back from Lorenz, of which he gave no account to and concealed from the lock company, was strongly contested upon the trial, and evidence given on the part of the Government, which it claimed tended to prove the concealment. The defendant, on the contrary, contended that these moneys, which he did not deny that he had received, were paid to him by Lorenz for services which defendant had performed for him and which moneys were known by Mr. Chance to have been paid and that he had, as president of the company, approved of such payments. It was further contended that Mr. Chance had seen the book in which the defendant had entered the fact and the dates of such receipts of money from Lorenz, and that the book had been given to Mr. Chance for the purpose of examination by him in his capacity as president; that Mr. Chance

had taken the book and had looked through it, and checked in lead pencil marks, in evidence of his approval, the various items, among which were the items showing the receipt of the moneys from Lorenz by defendant. The witness testified that such book, then offered in evidence by his counsel, was in the same condition when offered in evidence as it was when it was received back by him from Mr. Chance after his examination and approval of its entries.

The receipt of the book in evidence was objected to by counsel for the Government, and excluded by the court. "What is there," inquired the court, "to show that this book has not been altered since he made the entries" (meaning the defendant)? And again the court said: "I am very seriously in doubt as to whether you are entitled to have the book in evidence on the ground claimed for it, that is, that it was submitted to Chance; and on account of the condition of the book I will resolve that doubt against you." We do not see there was anything in the condition of the book (which was produced on the argument before us) that would prevent its being received in evidence.

We think the court erred in the exclusion of the book. It was not offered as an ordinary account book, showing accounts between different parties, but it was offered as a written corroboration of the evidence of the defendant when he testified that the receipt of the moneys by him from Lorenz was known by the company, and was not concealed from it by him, but, on the contrary, was put into a book which the president of the company saw, and which he checked as approved. It is true that the integrity of the items in the book depends upon the evidence of the defendant. He might have made all of them after this question arose. He might have so made the entries as to the receipt of the moneys from Lorenz. He might have forged the check marks alleged to have been made by Mr. Chance, but he testified that such was not the case; that the book was in the condition it was when he received it from Mr. Chance. We think it was competent to allow it to be shown

to the jury, and for the jury to decide as to its worth and weight. The book was a part of the transaction testified to by the defendant.

Various other questions were urged on the argument before us, but as those already discussed require a reversal of the judgment, we do not think it necessary to notice them.

The judgment is

*Reversed.*

MR. JUSTICE MOODY did not take any part in the decision of this case.