**BURDICK et al. v. BURDICK et al.**

Eq. No. 63271.

District Court of the United States for the District of Columbia.

June 27, 1940.

Spencer Gordon (of Covington, Burling, Rublee, Acheson & Shorb), of Washington, D. C., and Dallas Townsend (of Townsend & Lewis), of New York City, for trustees.

E. Barrett Prettyman (of Hewes, Prettyman & Awalt), of Washington, D. C. (F. G. Awalt and Raymond Sparks, both of Washington, D. C., on the brief), for adult defendants.

George C. Gertman, of Washington, D. C., guardian ad litem.

PINE, Justice.

Plaintiffs, as substituted and successor trustees under the last will and testament of Willard A. Lalor, deceased, have filed herein a supplemental complaint for the construction of said will and instructions as to their duties thereunder.

The testator was a resident of the District of Columbia. The will was dated November 19, 1930. There were two codicils dated November 12, 1932, and December 1, 1933, respectively. The testator died October 9, 1934. The will and codicils were admitted to probate and record by this Court holding a Probate Court on February 19, 1935, and thereafter letters testamentary were issued to the executors named therein. They were also named as trustees under a trust set up under the will. Thereafter the executors completed the administration of the estate and filed their first and final account, which was duly approved by this Court. Since the approval of the account of the executors, the plaintiff bank and plaintiff Burdick, or his predecessor trustee, have been acting as trustees under the will.

The amount of the estate which the executors turned over to themselves as Trustees was approximately $2,000,000. After the payment of the annuities provided by the trust and the expenses of administration, the accumulated income from the estate has been averaging approximately $50,000 per annum and will increase in amount in the future. The trust will terminate in about 1996, based on the life expectancies of two nieces whose lives determine the duration of the trust. It is conservatively estimated that the accumulations will amount to about $10,000,000 at the end of the trust period and the total trust fund will then be approximately $12,000,000.

The principal questions for determination grow out of Article Fifth of the will by which the testator gave his entire residuary estate to the trustees "to invest, re-invest and keep the same invested for the period of twenty-one (21) years after the death of both my nieces Esther Lalor and Ruth Lalor, and during such trust period to collect, recover and receive the issues, income, interest and profits thereof, and after deducting the commissions of the trustee and the proper and necessary expenses of the administration of the trust, to make payments from the same in quarterly installments" in the amounts and to the persons

set forth in succeeding paragraphs A to H, inclusive, of Article Fifth, namely, certain stated yearly annuities to his sister, brother, two nephews, three nieces, including the two on whose lives the trust is determined, and certain friends, the maximum individual annuity provided being $6,000 per annum. These beneficiaries included his sole heirs at law and next of kin:

In paragraph I of Article Fifth the testator directed that "the rest and remainder of the income * * * is to be reinvested by the trustee for the increase and benefit of this trust fund".

And further in paragraph I of Article Fifth he directed—"upon the expiration of the period of twenty-one (21) years after the date upon which the survivor of my said nieces Esther Lalor and Ruth Lalor shall have died, this trust shall terminate and my trustee shall forthwith assign, transfer and pay over the principal and accumulations of said trust fund, or the property into which the same may have been converted or the proceeds thereof" to the lawful issue per stirpes and not per capita of the two nieces on whose lives the trust is determined, one-fifth in each case, and to the other niece and two nephews one-fifth each and, if he or she be deceased, to his or her lawful issue per stirpes and not per capita.

■ The first question is whether the future remainder interests violate the common law "rule against perpetuities". This rule, as it relates to the remote vesting of title, is distinct from the more ancient rule against the suspension of alienation hereinafter discussed and embodied in statutory form in this jurisdiction. This rule originated in the 17th Century and was a limitation on real property. Originally confined to a period of lives in being and a reasonable time thereafter, it became crystallized into the limitation of a life or lives in being and twenty-one years thereafter plus the period of gestation and has been defined by the Supreme Court in McArthur v. Scott, 113 U.S. 340, 5 S.Ct. 652, 663, 28 L.Ed. 1015, to be as follows: " * * * The rule of the common law, by which an estate devised must at all events vest within a life or lives in being and 21 years afterwards, has reference to time and not to persons. Even the 'life or lives in being' have no reference to the persons who are to take, for the testator is allowed to select, as the measure of time, the lives of any persons now in existence; and the 'twenty-

one years afterwards' are not regulated by the birth or the coming of age of any person, for they begin, not with a birth, but with a death, and are 21 years in gross, without regard to the life or to the coming of age of any person soever."

■ There appears to be no doubt that the future interests in this case vest within the period limited by the "rule against perpetuities" inasmuch as the estates vest within lives in being and twenty-one years afterwards.

■ The second question is whether the future remainder interests contravene the District of Columbia statutes against the suspension of alienation.

The D.C.Code 1901, D.C.Code 1929, T. 25, § 112, contains the following statutory limitation upon the suspension of alienation of future estates: "Sec. 1023. Perpetuities.—Except in the case of gifts or devises to charitable uses, every future estate, whether of freehold or leasehold, whether by way of remainder or without a precedent estate, and whether vested or contingent, shall be void in its creation which shall suspend, or may by possibility suspend, the power of absolute alienation of the property, so that there shall be no person or persons in being by whom an absolute fee in the same, in possession, can be conveyed, for a longer period than during the continuance of not more than one or more lives in being and twenty-one years thereafter."

The future interests in the instant case involve personal property, but Sec. 1023, supra, is made applicable to personalty as well as realty by Sec. 1036, D.C.Code 1901, D.C.Code 1929, T. 25, § 283, appearing at the end of the subchapter containing Sec. 1023, supra, reading as follows: "Sec. 1036. * * * All the provisions of this subchapter shall apply to personal property generally except where from the nature of the property they are inapplicable."

In Shoemaker v. Newman, 62 App.D.C. 120, 65 F.2d 208, 89 A.L.R. 1034, the Court of Appeals held, in effect that the statute relating to restraints on alienation was not violated when the trustees had power at all times to alienate. They have such power in the present instance and this would seem to be sufficient answer to the question raised.

However, it has been suggested that the language of the Court of Appeals is broader than that required by the deci-

sion, and that this Court should follow the rule laid down in a number of jurisdictions that a power to sell the original trust property and hold the proceeds in trust is not a power to alienate within the meaning of the statute against suspension of alienation and does not save the trust. On this hypothesis the question presented is whether there is a "possibility" of the suspension of the power of "absolute alienation" for a longer period than that delimited. It is possible that at the time prescribed for the division of the estate some of those entitled thereto may be infants or under disability and as such unable to alienate the property then received. This possibility, however, does not invalidate the trust inasmuch as the suspension of the power of alienation prohibited by the Code is such a suspension as arises from the terms of the instrument by which the estate is created and not such as might exist by reason of disability of the person in whom such interest vests at the time of vesting. Any such suspension would be made by the law and not by the will. Shoemaker v. Newman, supra, 62 App.D.C. page 125, 65 F.2d 208, 89 A.L.R. 1034; In re Pforr's Estate, 144 Cal. 121, 77 P. 825; In re Campbell's Estate, 149 Cal. 712, 87 P. 573; In re Murphy's Estate, 99 Mont. 114, 43 P.2d 233, 238. See also Secs. 39, 44, 45, 53, 57, 58, 59, and 61, T. 15, D.C.Code, 1929, relating to the power of the Court to appoint a guardian of an infant's estate having power to convey absolute fee. Article Fifth of the will would therefore appear not to be in violation of Sec. 1023 of the D.C.Code, 1901.

The next and more difficult question is whether the provision of Paragraph I of Article Fifth that the remainder of the income after the payment of annuities is to be reinvested for the increase and benefit of the trust fund can be sustained under the law. For the reasons above given, this provision does not extend beyond the permissive boundaries upon restraints on alienation or remote vesting and it is not in violation of the law in this respect on the assumption of their applicability; but such boundaries, judicial and statutory, do not expressly apply to accumulations, and the limitation upon valid accumulations must be found elsewhere unless by analogy the rules against remote vesting and suspension of alienation apply.

There is in the District of Columbia no specific statutory limitation upon restraint on alienation of accumulations.

In Sec. 1 of the D.C.Code, 1901,[1] it is provided: "Section 1. The common law, all British statutes in force in Maryland on the twenty-seventh day of February, eighteen hundred and one, the principles of equity and admiralty, all general acts of Congress not locally inapplicable in the District of Columbia, and all acts of Congress by their terms applicable to the District of Columbia and to other places under the jurisdiction of the United States, in force at the date of the passage of this act shall remain in force except in so far as the same are inconsistent with, or are replaced by, some provision of this code."

Sec. 1636 of this Code provided: "All acts and parts of acts of the general assembly of the State of Maryland general and permanent in their nature * * * are hereby repealed * * *".

Sec. 1640 provided: "Nothing in the repealing clause of this code contained shall be held to affect the operation or enforcement in the District of Columbia of the common law or of any British statute in force in Maryland on the twenty-seventh day of February, eighteen hundred and one, or of the principles of equity or admiralty, or of any general statute of the United States not locally inapplicable in the District of Columbia or by its terms applicable to the District of Columbia and to other places under the jurisdiction of the United States * * *".[2]

In the absence of specific statutory limitation, as in this case, the above quoted general provisions of the D.C.Code, 1901, provide the following juridical bases for determination of the District of Columbia laws:

1. British statutes in force in Maryland on February 27, 1801.

2. The common law, and principles of equity.

---

[1] The D.C.Code, 1929, T. 1, § 21, eliminates the provision in respect of the British Statutes in force in Maryland on February 27, 1801, but the D.C.Code, 1929, was not an act of Congress. The D.C.Code, 1901, was an Act of Congress.

[2] There are no general acts of Congress not locally inapplicable in the District of Columbia, nor acts of Congress by their terms applicable to the District of Columbia and to other places under the jurisdiction of the United States, pertaining to this subject.

Referring first to the British statutes in force in Maryland on February 27, 1801,[3] it has been urged by the adult defendants that what Congress intended was the common law as amended and improved by British statutes enacted up to February 27, 1801. I cannot subscribe to this view. This reads into the Code a concept which is not there. The reason for their contention in this regard is to bring into the law of the District of Columbia an act of the British Parliament enacted in 1800 known as the Thellusson Act (39, 40 Geo. Ill, Chap. 98), which grew out of the case of Thellusson v. Woodford, 4 Ves.Jr. 227, 11 Ves.Jr. 112, upholding the validity of accumulations of the character here involved and hereinafter discussed.

I am of the opinion that the meaning of the expression "all British statutes in force in Maryland on the twenty-seventh day of February, eighteen hundred and one" is ascertainable from an examination of the Maryland Declaration of Rights of 1776. That declaration, in Sec. 3, provided that the inhabitants of Maryland were entitled to "the benefit of such of the English statutes, as existed at the time of their first emigration, and which, by experience, have been found applicable to their * * * circumstances.", and also to "the benefit * * * of such others as have been since made in England, or Great Britain, and have been introduced, used and practised by the courts of law or equity."

■ Of course, no British statutes were "in force" in Maryland in 1801 nor had any been in force, legally or literally speaking, since 1783, the date of the treaty establishing the independence of the Colonies, or probably since 1776 when the Colonies declared their independence, but by the Maryland Declaration of Rights of 1776 the Maryland inhabitants were entitled to the benefit of English statutes found applicable to their circumstances and introduced, used and practiced by their courts. This was a simple verbal expedient for the retention of the statutory law as it was unless and until amended by the Legislature of Maryland. It would be unrealistic to assume as contended by defendants, that any act of British Parliament enacted between 1776 and 1801 had any force and effect in Maryland or that Congress in enacting the D.C.Code of 1901 intended any such assumption.

Based on the foregoing, it is my opinion that this provision in the D.C.Code, 1901, was intended by the Congress to mean those British statutes to the benefit of which the Maryland inhabitants were entitled under the Maryland Declaration of Rights of 1776 which were still recognized as being in force in Maryland in 1801 as part of the laws of Maryland under such Declaration of Rights, and that this provision did not intend to incorporate in the District of Columbia law, either as amending the common law or otherwise, British statutes enacted between 1776 and 1801. Entertaining this view, the Thellusson Act, supra, enacted by the British Parliament in 1800, is not applicable to this case. There appear to be no prior British statutes on the subject. Compare DeForest v. United States, infra.

■ As to the provision in Sec. 1 of the D.C.Code, 1901, that the common law shall remain in force in the District of Columbia, Congress intended the common law of England as it existed in Maryland on February 27, 1801, and so far as it had not become obsolete or unsuited to our conditions. This is borne out by the case of DeForest v. United States, 11 App.D.C. 458, 465, 466, decided in 1897 shortly before the enactment of the D.C.Code, 1901. In that case the Court of Appeals of the District of Columbia had under consideration an appeal from the Police Court of the District of Columbia in which the appellant had been charged and found guilty of maintaining a common bawdy house. The point was raised that the appellant's offense was a common law offense and that there were no common law offenses against the United States. The Court, in the course of its opinion, holding that there can be common law offenses against the United States in the District of Columbia, stated as follows:

"For the District of Columbia it is competent for the Congress of the United States to declare that the common law is to be regarded as in force, and even in the absence of express statutory enactment we should have to hold, in view of the circumstances, that the common law in its entirety, both in its civil and criminal branches, except in so far as it has been modified by statute *or has been repugnant to our conditions,* is in force in the District of

---

[3] This was the effective date of the first act of Congress providing for a Federal Government of the District of Columbia.

Columbia. But we are not left to implication in that regard.

"At the time of the cession of the Territory of Columbia by the State of Maryland to the Federal Union, its law, as well as that of the rest of the States, was the common law of England, both civil and criminal, *so far as that common law was suited to our condition and was unaffected by statute.* And with the common law the State of Maryland had adopted a considerable part of the statute law of England. When by the act of February 27, 1801 (2 Stat. 103), the Congress of the United States finally accepted the cession and assumed jurisdiction over the ceded District, it was specifically provided 'that the laws of the State of Maryland, as they now (then) exist, shall be and continue in force in that part of the said District which was ceded by that State to the United States and by them accepted.' *This express enactment, if any such enactment was needed at all, was amply sufficient to continue in force and to perpetuate to the present day in the District of Columbia the common law of England as it existed in Maryland at that time, with all the existing statute legislation of the State and all the statute legislation of England that had been adopted by Maryland.* And upon that theory of the law we have been conducting our affairs for nearly a hundred years. It is very true that much of the criminal branch of our common law has either become obsolete or has been obliterated by statutory enactment upon the same subject. Nevertheless, it is true that where it has not been repealed by express statutory provision, or modified by inconsistent legislation, or *where it has not become obsolete* or unsuited to our republican form of government, the common law of England in all its branches, both civil and criminal, remains to-day the law of the District of Columbia, and it has been repeatedly so held. See United States v. Watkins [Fed.Cas.No.16,649], 3 Cranch C.C. 441; United States v. Marshall, 6 Mackey [17 D.C.] 34; United States v. Hale [Fed.Cas.No.15,279], 4 Cranch C.C. 83." (Italics supplied.)

The foregoing statement of the common law in existence in the District of Columbia has been affirmed in the following cases: Hill v. United States, 1903, 22 App.D.C. 395, 401; Tyner v. United States, 1904, 23 App.D.C. 324, 359; Lisner v. Hughes, 1919, 49 App.D.C. 40, 41, 258 F. 512.

I therefore conclude that the common law referred to by Congress in the 1901 Code, was the same common law referred to by the Court of Appeals of the District four years before, namely, the common law of England as it existed in Maryland in 1801 and as otherwise limited by the opinion in DeForest v. United States, supra. This common law applicable to the District of Columbia is therefore not identical with the common law of England. The fact that it is not identical has been recognized by the Supreme Court of the United States in Van Ness v. Pacard, 1829, 2 Pet. 137, 144, 7 L.Ed. 374, 377, in a case coming up from the District of Columbia, wherein the Supreme Court stated: "The common law of England is not to be taken, in all respects, to be that of America. Our ancestors brought with them its general principles, and claimed it as their birthright; but they brought with them and adopted, *only that portion which was applicable to their situation.*" (Italics supplied.)

To the same effect is Wheaton et al. v. Peters, 1834, 8 Pet. 591, 607, 8 L.Ed. 1055, 1061; United States v. Reid et al., 1851, 12 How. 361, 363, 13 L.Ed. 1023, 1025; Crawford v. United States, 1909, 212 U.S. 183, 185, 195, 29 S.Ct. 260, 53 L.Ed. 465, 471, 15 Ann.Cas. 392.

■ First turning to the English authorities to ascertain the common law of England, the historic case, and for all practical purposes the only case, where the question here involved was squarely presented is Thellusson v. Woodford, supra, decided in 1799. There the testator, an English merchant, left an estate of over £600,000 in trust for the lives of all of his then living descendants, which included his grandchildren, with the income to be accumulated. On the death of the surviving descendant the estate was directed to be divided between the three eldest male descendants of his three sons. It was similar to the instant trust in that it was appreciated that the trust would continue for a long time, and it was in 1856 when the last survivor died. The trustees sued for instructions and the heirs sued to have the trust declared void on the ground that it was both a misuse of executory devise and invalid on account of the accumulation directed. After severely criticising the testator's disposition, the Court reluctantly sustained the trust and held that since the postponement of vesting was permitted under the law, ac-

cumulations must be allowed for a like period. The case brought a storm of protest and resulted almost immediately in the remedial legislation known as the Thellusson Act, supra, invalidating such dispositions in the future. It is true that this case is expressive of the common law of England, but clearly this decision, quickly repudiated by a remedial act of Parliament, has no binding effect on the courts of this country. Greenwood v. Greenwood, 28 Md. 369; Bowie v. Duvall, 1 Gill & J., Md., 175. Moreover, as above pointed out, the common law of England as of 1799 is not necessarily the common law of England as it existed in Maryland in 1801.

Next turning to the American authorities, there appears to be no case in Maryland or the District of Columbia bearing on the question for decision herein.

However, the Supreme Court of the United States has had the question before it in an appeal from the Supreme Court of the Territory of Hawaii in the case of Fitchie v. Brown, 1908, 211 U.S. 321, 29 S.Ct. 106, 107, 53 L.Ed. 202. This case involved a will which created a trust "for as long a period as is legally possible, the termination or ending of such trust to take place when the law requires it under the statute". The testator was a resident of Hawaii. The legacies did not exhaust the income and an annual accumulation was involved. The Court held that the trust was valid for a period of twenty-one years after death of the surviving annuitant, saying: "Our first inquiry is, Was this trust valid as a whole? It is conceded by all that the common law is applicable, and that there is no statute in Hawaii governing the subject, except the statute making the common law applicable there, and that the utmost extent of a trust at common law is limited by lives in being at its creation and for twenty-one years thereafter; that the lives must be selected by the testator in his will; that they must be ascertained lives, i. e. lives that can be distinguished, and the fact of the death of the last survivor must be capable of being made out by reasonable evidence (Thellusson v. Woodford, 4 Ves. Jr. 227 [S.C.], 11 Ves.Jr. 134, 146; In re Moore (1901) 1 Ch. 936), and the selected lives need not be those having an interest in the property."

The Court then has the following to say with respect to the surplus income: "We therefore sustain the validity of the trust in this case, and the question remaining is as to the disposition of the surplus income arising during the payment of the annuities. The will shows that the testator supposed there would be such surplus. Should it be accumulated or paid to the heirs of testator? We think the surplus, after paying annuities, must accumulate as part of the trust estate until the time arrives for the distribution of that estate, and that such accumulation must then be distributed as a part thereof to those who will then have the right to take the estate as provided for in the will."

The law of Hawaii, as revealed by the decision of the lower court in this case, Fitchie v. Brown, 18 Hawaii 52, was: "* * * the English common law which is declared in the Judiciary Act of 1892 (R.L., Sec. 1) to be in force here [in Hawaii]."

I cannot share the view of the guardian ad litem that this case expresses the common law of England applicable to the District of Columbia. I am of the opinion that it expresses only the common law of England declared in the Judiciary Act of 1892 to be in force in Hawaii. This is borne out by the fact that it seems to have been conceded that the Thellusson case expressed the common law of England, as indeed it did, as of 1799.

With respect to other cases in American jurisprudence, there is a dearth of precedent. Obviously, the courts are rarely required to pass upon the validity of directions for stupendous accumulations of the character here involved. Notwithstanding the industry, diligence and high ability of all counsel appearing herein, no case has been brought to light which provides any real guidance.

It is therefore the responsibility of the Court to determine, without controlling or guiding precedents, whether the provision in this will for the restraint on the enjoyment of the accumulations of this trust can be sustained under the law.

As heretofore stated the common law applicable to the District of Columbia is the common law defined in the case of DeForest v. United States, supra, that is, the common law of England as it existed in Maryland in 1801 except where it has become "obsolete" or is "repugnant to our conditions".

The English common law carried into the law of Hawaii apparently did not pos-

sess these attendant modernizing exceptions, as above pointed out.

■ After mature deliberation, I have come to the conclusion that such common law, so far as it permits accumulations of the character in this suit, is obsolete and repugnant to our conditions and therefore not applicable to the District of Columbia. As a matter of fact, it was considered obsolete and not suited to conditions in England in 1799 because it was repudiated the following year by statute. The utmost boundaries permitting restraints are expressed in the rule against remote vesting and the statute against restraints on alienation which do not apply expressly to accumulations, as above pointed out. It would be clearly contrary to the trend of the law and a step backward to include accumulations of the character involved herein to be within the permissive rules above referred to simply because of the discredited and vehemently criticized[4] decision in the Thellusson case, supra, which for the reasons above stated is neither binding on the courts of the District of Columbia, nor expressive of the common law in force therein. Public interest and welfare forbid that a dead hand from the past should shape and control the present except so far as permitted by law. Permitting *unreasonable* restraints on alienation are inconsistent with the principles of democracy. They are the concomitants of an aristocracy. Such restraints are relics of a feudal society, are obsolete and are repugnant to our institutions and conditions.

■ It is therefore my conclusion that under the particular circumstances of this case the provision in respect of accumulations contained in Paragraph I of Article Fifth, involving as it does the inalienable accumulation of a huge sum of money, probably $10,000,000 for a period probably in excess of sixty years, is invalid and cannot be sustained.

In reaching this conclusion I am not un-

mindful of the admonition of the Supreme Court contained in Shelton v. King, 229 U.S. 90, 33 S.Ct. 686, 690, 57 L.Ed. 1086, that: "There is no higher duty which rests upon a court than to carry out the intentions of a testator when the provision is not repugnant to settled principles of public policy and is otherwise valid."

But in the still later case of Funk v. United States, 290 U.S. 371, 54 S.Ct. 212, 216, 78 L.Ed. 369, holding that the wife of defendant in a criminal case was a competent witness in his behalf, the Supreme Court, while stating that the Federal Courts do not have power to amend or repeal any rule or principle of the common law, nevertheless in the complete absence of specific Congressional legislation on the subject, these courts do have the power " * * * to declare and effectuate, upon common-law principles, what is the present rule upon a given subject in the light of fundamentally altered conditions, without regard to what has previously been declared and practiced. It has been said so often as to have become axiomatic that the common law is not immutable but flexible, and by its own principles adapts itself to varying conditions."

The remaining questions raised by the complaint are disposed of as follows:

■ The trustees should exercise their sound discretion in holding and disposing of securities received by them as a result of reorganization proceedings of corporations in which the testator held securities although such reorganization securities do not qualify as legal investments for the trustees under Paragraph 2 of Article Seventh.

The question of the amount of the bond has been determined.

The other questions should not be answered at this time under the authority of May v. May, 167 U.S. 310, 17 S.Ct. 824, 42 L.Ed. 179.

---

4 The following criticism of the Thellusson decision appears in Kent's Commentaries: "This is the most extraordinary instance upon record of calculating and unfeeling pride and vanity in a testator, disregarding the ease and comfort of his immediate descendants, for the miserable satisfaction of enjoying in anticipation the wealth and aggrandizement of a distant posterity. Such an iron-hearted scheme of settlement, by withdrawing property for so long a period from all the uses and purposes of social life, was intolerable." 13th Ed., Vol. IV, page 286.